Lois O. HARRIMAN (Plaintiff), Appellant,

v.

John W. HARRIMAN (Defendant),
Respondent.

No. 29058.

St. Louis Court of Appeals.
Missouri.

June 14, 1955.

Motion for Rehearing or for Transfer to
Supreme Court Denied Sept. 9, 1955.

Speros B. Boudoures, Norman Bierman,
Norris H. Allen, Anderson, Gilbert, Wol-

fort, Allen & Bierman, St. Louis, for appellant.

Barrett, Cook & Fairfield, Samuel B. Murphy, Joseph J. Howard, St. Louis, for respondent.

ANDERSON, Presiding Judge.

This is an appeal by plaintiff, Lois O. Harriman, from a judgment of the Circuit Court rendered on plaintiff's motion to modify a decree of divorce with respect to allowances for alimony, and maintenance for the minor child of the parties. It is urged that said allowances were inadequate.

Plaintiff obtained a decree of divorce from defendant in the Circuit Court of St. Louis County on March 8, 1945. By said decree plaintiff was granted the custody of the three minor children, William W. Harriman, aged 15; Ann Harriman, aged 14; and John W. Harriman, Jr., aged 9. By said decree defendant was ordered to pay plaintiff the sum of $95 per month for the support of the children and $70 per month as alimony. On January 23, 1947, the court modified the original decree by transferring the custody of the minor child, William W. Harriman, to the defendant, and reducing the allowance to plaintiff for the support of the other two children to $70. The judgment appealed from, which was entered December 21, 1953, further modified the decree by increasing the alimony allowance for plaintiff to $100 per month and fixing the allowance for the support of the minor child, John, at $50 per month. The court allowed plaintiff an attorney's fee in the sum of $50.

On March 7, 1945, prior to the divorce, a separation agreement was entered into by the parties. By this agreement the home, located in Glendale, Missouri, and held as tenants by the entireties, was conveyed to plaintiff. There was a deed of trust on this property to secure an indebtedness of $4,000 principal amount and interest at six per cent per annum payable in monthly installments of $47.36 each, $7.36 of which was applicable to taxes and insurance—the balance was applicable to interest and the re-

duction of the loan. It was agreed that defendant would pay off this indebtedness by paying to plaintiff the sum of $47.36 each month to be applied by her in liquidation of the debt. At the time the agreement was made there were 102 unpaid installment notes, payable on the first day of each month from April, 1945, to September, 1953, inclusive.

The agreement further provided that should plaintiff dispose of said premises and discharge said debt, and thereafter acquire another dwelling house on which there was a mortgage plaintiff should apply the monthly payments made to her by defendant to the payment of the principal or interest due on such subsequent indebtedness.

There was another provision of the contract conferring certain rights on plaintiff in the event of default by defendant of his obligation to make the monthly payments to plaintiff for payments on the mortgage; a provision permitting defendant to pay the mortgage indebtedness in full at any time while plaintiff should remain the owner of the property; a provision for the payment to plaintiff of the sum of $40 per month, in lieu of the $47.36 payments, in the event of the satisfaction of the note and deed of trust otherwise than by full payment thereof by defendant, or, in the alternative, a lump sum payment to plaintiff equal to the present value of the remaining payments, based on a discount rate of six per cent; a provision ratifying the division theretofore made by the parties of certain furniture and other articles of personal or domestic use; and a provision requiring defendant to provide clothing, shoes and shoe repairs for William W. Harriman during his minority.

It was further stipulated that the agreement was not intended as a complete settlement between the parties, and that the benefits to plaintiff provided for in the contract were not intended "as in satisfaction or in lieu of any of the rights which Second Party (plaintiff) would have or any of the remedies available to her if this agreement had not been entered into, nor does Second Party waive or relinquish any of such rights or remedies."

The agreement further provided that the parties would file a stipulation in the divorce proceeding to the effect that, if a decree of divorce be rendered in favor of plaintiff, such decree might include provisions (a) for alimony to plaintiff in the sum of $70 per month; (b) for custody of the minor children in plaintiff, with certain visitation rights to defendant; (c) for the sum of $35 per month each for the support of Ann and John W. Harriman, Jr., and $25 per month for the support of William W. Harriman.

It was then provided that the stipulation "shall be presented to the court only for the purpose of expressing the joint opinion and agreement of the parties with respect to provisions which may properly be included in a decree or judgment of divorce, if such a judgment or decree should be rendered in favor of Second Party, and that nothing in such stipulation or in this agreement shall in anywise affect the jurisdiction and responsibility of the court before which said action is pending to adjudicate all of the issues in said action in accordance with the law and upon the evidence presented and to determine the provisions of any judgment or decree to be rendered therein."

The separation agreement recited that defendant "has represented to Second Party (plaintiff) that his present net income is at the rate of approximately fifty-six hundred dollars ($5,600) per year after payment of Federal income taxes, and that he is presently obligated to make installment payments upon amounts of indebtedness aggregating seven thousand nine hundred and thirty-six dollars ($7,936.00)."

At the time of the divorce plaintiff was employed part time, earning $40 per month. In October, 1946, plaintiff sold her home in Glendale, the sale price being $10,000. After paying taxes, commissions, prorations and the mortgage, plaintiff netted about $4,000 from the sale. Plaintiff then moved to Evanston, Illinois, and took up residence in an old three-story duplex house which she and her sister had inherited. Plaintiff paid her sister $5,000 for her half-interest in the house and assumed the entire $4,000 mortgage which then existed on the property. In 1949 the property was refinanced and the mortgage increased to $5,600. The house was in very bad condition at the time and plaintiff spent about $3,500, which she borrowed from her brother-in-law, for repairing the property.

Thereafter, plaintiff lived in one-half of this house with her two children. She also rented three rooms to another family. This family stayed on the premises from October, 1946, to June, 1947. In September, 1947, she rented these rooms to students attending Northwestern University. The other half of the duplex was rented to tenants for $65 per month. Plaintiff testified she suffered a net loss each year thereafter from the operation of the premises and, on that account, sold the other half of the duplex in August, 1950. The sale price was $9,000, and after paying off debts theretofore incurred there was nothing left. Nothing was paid on the mortgage. The unpaid mortgage on the property amounts to forty-three or forty-four hundred dollars. Plaintiff testified she was still indebted to her brother-in-law in the sum of $1,000, and owed her sister $2,000. In 1951 plaintiff suffered a net loss of $933.56 in the operation of her half of the premises. Thereafter, in 1952, she moved into two rooms and, by renting the rest of the house to roomers, was able to net $73 profit for the year. Plaintiff has no other property. During 1953 plaintiff rented part of the premises for $110 per month for the first six months, and beginning in August to other roomers for $90 per month. The daughter Ann, 23 years of age at the time of the hearing, and John, the minor son, live with plaintiff.

Plaintiff is employed by the Chicago Daily News. Her average take-home pay amounts to $45 or $46 per week. The daughter, Ann, is also employed by the Chicago Daily News and pays as her share of the groceries purchased for the family the sum of $8 or $10 per week, but pays nothing for her room.

The son John was seventeen years of age at the time of the trial below. He was a senior at Loyola High School and was

attending that school on a scholarship. He received from his mother the sum of $1 a day for carfare and lunch. There was also a charge of $3 per week for his attendance at school. John worked during two summer vacations. One year, by working after school hours and during vacation, he was able to earn about $800, out of which he paid his mother $104 to be applied on his school bills. During the summer of 1953 he earned about $300. He did not pay any of this to his mother for his room and board, but did pay about $60 on a school bill, and $60 on a dentist bill.

After Ann graduated from high school plaintiff borrowed money from her brother-in-law to send Ann to college. She attended Mundelin College in Chicago. In June, 1949, defendant stated that he would like to help Ann get through college and suggested a lump sum settlement of his obligation with reference to the $47.36 monthly mortgage payments. According to plaintiff, this payment was in the sum of $2,000. Defendant testified that when he made the lump sum settlement he told plaintiff that he hoped some of it might be used for Ann's education. Ann attended Mundelin College for two years, and this money was used for that purpose. Thereafter, Ann attended the University of Missouri for two and one-half years. Defendant paid Ann's expenses at the University.

The evidence further shows that plaintiff had an operation for tumor of the uterus in May, 1944, and again in October, 1944. Thereafter, she received radium treatment for her condition. Plaintiff testified that she is suffering from high blood pressure and is compelled to go to the hospital every Saturday for injections. She stated she began having this trouble in 1950, and in July, 1952, became ill while at work. At that time she consulted Dr. Ranke who has since continued to treat her. During this period she was also treated by her brother-in-law Dr. Sylvester E. Coffey of Milwaukee. She further testified that she was going to have an operation for the removal of a fibroid tumor, and that the reason she had not undergone such operation was because it had been impossible to keep her blood pressure down. Dr. Coffey's affidavit was read at the trial. In it he stated:

"Mrs. Harriman has been under medical observation and care for some years up to the present time, including periodic examinations. On one phase of her physical condition, which has been of considerable concern, is her present elevation of blood pressure. This has ranged from approximately 160/100 to 200/110–120. This latter, of course, being definitely dangerous, as regards to heart damage, possibility of strokes and kidney damage. Another pathological feature is the disturbance of uterine function, which at one period caused such heavy bleeding that hospital residence, and use of radium, was required. There is also presence of a fibroid tumor in the uterus, and this should be removed surgically because of the danger of possible malignant changes; * * * a total hysterectomy being the operation of choice.

"Her nervous and emotional state is quite unstable, this being due to several factors, including menopause and post-menopausal changes; also financial worries, family problems, attempting to work full time and maintain a household, etc. She has been requested repeatedly to try to arrange that full time working could be eliminated; working shorter hours would be of great help. Also, to arrange, as soon as possible, to have pelvic surgery done to correct existing conditions, and to prevent possible malignant complications.

"Further, she should try to relieve herself of financial and family strains, and also adjust living conditions to improve her emotional and nervous status. This is very important, in regard to her elevated blood pressure, which can be considered on the border of a malignant type resulting, if not improved, in possible severe heart and kidney damage."

Plaintiff testified that her monthly expense for injections and medicine varied between nine and twelve dollars a month, depending on whether she purchased the medicine wholesale or retail.

At the time of the trial below plaintiff was fifty-one years of age.

Defendant is employed by the St. Louis Tool Company as plant manager. He has been employed in that capacity for the last nine and one-half years. His annual salary as manager amounts to $8,160. In addition, defendant has received a bonus each year since 1949 of $12,500. He stated the bonus was purely a voluntary affair and that there was no contract for its payment.

Defendant owns a business known as the Eighth Street Public Scale. The property is leased subject to a sixty day cancellation. Defendant stated he would sell the scale business for $5,000. In 1952 defendant's income from the scale business amounted to $450. For 1953, defendant stated that the profit would exceed that of the year previous by about $1,000. Defendant owns a half interest in two farms in Texas which he inherited from his grandfather in 1928. His sister owns the other half interest. The land is under lease. Defendant's share of the income from the land in 1953 was $600.

Defendant and his present wife own the home in which they live. It is located on Lake Wauwanoka, in Jefferson County. Defendant has for several years owned the ground on which the house is built. He started to build the house about one year prior to the trial below. He has spent about $31,000 on the house. The lot cost him $2,800. The house is not finished.

Defendant testified that he had $4,700 in a joint bank account with his present wife; $600 on deposit in a "scale" account in his own name; and a savings account with his sister in connection with the Texas land, the amount of which is not shown.

Appellant contends that the allowances made by the trial court were so grossly inadequate as to amount to an abuse of judicial discretion. Respondent's position is that said allowances were amply sufficient, considering the circumstances of the parties.

An award of alimony to the divorced wife is based on the principle that it is the statutory duty of the husband, in so far as he is able, to contribute such amount as will, supplemented by the wife's earnings and other income, enable her to live according to the station in life which she enjoyed when the decree of divorce was granted. Such being its foundation, our statute, Section 452.070 RSMo 1949, V.A. M.S., wisely recognizes that a change in circumstances may require a change in the decree; and as the measure of the sum required is necessarily the needs of the wife and the ability of the husband to pay, the amount allowed will logically be affected by a change in either element.

■ This does not mean that an increase in the husband's wealth and earning capacity alone justifies an increase in alimony. The husband in such cases should not be compelled to guarantee the wife a standard of living based upon his present means. The wife in such instances voluntarily assumed the status of an unmarried person. She contributed nothing to the husband's acquisition of wealth since the entry of the divorce decree, and therefore cannot logically claim that, because she was his wife for several years before good fortune came to him, she now has a right to participate therein. The increase in wealth and earning power on the part of the husband can only be considered in connection with his ability to meet the increased cost of maintaining the wife in that station in life enjoyed by her at the time of the divorce.

■ In an action in which there is no definite or legal measure of recovery, which is especially true in cases such as the one at bar, the amount properly allowable is deemed a matter of discretion for the trial judge to such an extent that his decision will not be disturbed unless the amount awarded is so excessive or inadequate as to appear to be an abuse of judicial dis-

cretion. If it appears that the discretionary power was not soundly exercised, it becomes the duty of the reviewing court to reject the ruling made. State ex rel. Piepmeier v. Camren, 226 Mo.App. 100, 41 S.W.2d 902; Feurt v. Caster, 174 Mo. 289, 73 S.W. 576.

■ A joint definition of the terms "judicial discretion" and "abuse of judicial discretion" which has been almost universally adopted by the courts in this country is to be found in Bowers' "Judicial Discretion of Trial Courts," section 12, page 20, as follows:

"The accepted understanding of the term does not necessarily, or very frequently, mean that any aspersions whatever are cast upon the trial court. Defining the two terms together, it may be said that judicial discretion is the option which the judge may exercise between the doing and the not doing of a thing, the doing of which can not be demanded as an absolute right of the party asking it to be done; and that an abuse of discretion is an erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn from such facts and circumstances. While it may amount to an axiom to say that difference in judicial opinion is not synonymous with abuse of judicial discretion, it yet remains true that the latter signifies that a ruling or decision has been made that is clearly untenable. * * * It is really a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence."

■ From a consideration of the evidence in this case we have reached the conclusion that the trial court abused its discretion in awarding an increase of only $30 a month in alimony to plaintiff. We will not again review in detail the evidence which leads us to this conclusion. Suffice it to say that plaintiff adduced ample evidence of changed circumstances which demand a much larger increase in defendant's contribution to her support than that allowed by the trial court.

There can be no doubt that the financial requirements of plaintiff have substantially increased since the divorce decree was entered in 1945. This has been due largely to the shrinkage in the purchasing power of the dollar, of which we take judicial notice. Her debts have increased materially, due to unforeseen expenses incident to the repair of her home, as well as for the education of Ann. Her health has become impaired to such an extent that her physician has advised her not to work full time. This, of course, means diminished income. Defendant has experienced a large increase of income, amply sufficient to take care of her needs.

In our judgment, the alimony award should be increased to $150 per month.

The allowance of $50 per month for the support of John is wholly inadequate. The amount should be increased to $125 per month.

■■ Finally, it is urged that the award of $50 as and for an attorney's fee was grossly inadequate. Plaintiff's attorney testified:

"This case was forwarded to us by Reinhardt, Bebb & Davis of Chicago, Illinois, in March, 1952.

"I conducted the investigation and examined the file in this matter, checking all the court papers, motions, and conducted correspondence with Mrs. Harriman, the forwarding attorneys, and Mr. Howard; and prepared interrogatories, and filed and forwarded answers to interrogatories and defendant's interrogatories to the corresponding attorneys in Chicago; had numerous phone conversations with Mr. Howard, on 6/23/52, 12/8/52, 3/3/53, 4/2/53, 9/11/53, 10/27/53 and 10/28/53. I conferred personally with Mr. Howard about hearing motion on October 30, 1953; met Mr. Howard

on several occasions; conferred with the Court on special settings. Personal conferences with client on 10/30/53 and on 12/19/53. Appeared in court to have motion reinstated. Preparation of case for trial; research and preparation of trial memorandum; trial of lawsuit.

"An approximate amount of thirty-five hours was spent in this case."

In answer to appellant's contention under this last assignment respondent urges, first, that appellant is financially able to bear all of her expense in connection with the motion; and, second, to increase the allowance, which he admits is unreasonable in amount, might encourage appellant and other divorced women to hereafter file similar motions.

The evidence shows that appellant owns the house in which she and the children live. Its value, according to appellant's testimony, is approximately $10,000. There is a $4,400 mortgage on the premises. Appellant is indebted to her brother-in-law in the sum of $1,000, and owes her sister $2,000. Appellant owns no other property. Under the circumstances, we do not believe that appellant should be required to sell her home, or add to her heavy burden of debt by increasing the mortgage indebtedness on the premises, in order to pay the necessary expense of prosecuting her suit. Burtrum v. Burtrum, Mo.App., 200 S.W.2d 80; Gregg v. Gregg, Mo.App., 272 S.W.2d 855; Robertson v. Robertson, 137 Mo.App. 93, 119 S.W. 533.

By making an allowance for an attorney's fee the trial court necessarily found that under the evidence appellant was entitled thereto. Burtrum v. Burtrum, Mo.App., 200 S.W.2d 80; Hall v. Hall, Mo.App., 179 S.W. 738. We concur in that finding, but disagree with the trial court as to the proper amount to be allowed. In our judgment, a proper amount, considering the nature and amount of work performed by the attorney, would be the sum of $350. Respondent's contention that appellant should be denied such allowance, for the reason that it might encourage future litigation, must, in our opinion, be rejected. The reasons which prompt us to this view are obvious.

The judgment appealed from is reversed and the cause is remanded with directions to the trial court to enter a new judgment allowing plaintiff $150 per month as alimony for maintenance and support, commencing as of the date of the judgment appealed from; allowing plaintiff $125 per month for the maintenance and support of the minor child, John, commencing as of the date of the judgment appealed from; and the sum of $350 as and for an attorney's fee for services rendered by plaintiff's attorney in the trial court.

SAM C. BLAIR and FRANKLIN FERRISS, Special Judges, concur.