**Mary Frances SIMMONS, Plaintiff-Appellant,**

v.

**Harvey SIMMONS, Defendant-Respondent.**

No. 7367.

Springfield Court of Appeals, Missouri.

June 23, 1955.

Kirby W. Patterson, Springfield, for plaintiff-appellant.

Don W. Owensby, Theo. G. Scott, Buffalo, for defendant-respondent.

RUARK, Judge.

Mary Frances Simmons sued Harvey Simmons for divorce, alimony and attorney fees. Defendant responded with a cross-petition. The court found plaintiff to be the innocent and injured party and adjudged her the divorce but refused to grant alimony or attorney fees as prayed. From this judgment, and the overruling of plaintiff's motion to amend under Section 510.-310 RSMo 1949, V.A.M.S., plaintiff has appealed. Defendant did not appeal. The sole question here is whether or not the alimony and attorney fees should have been allowed.

Plaintiff and defendant were married on August 10, 1952. At that time plaintiff was not yet fifty-seven years of age, a widow with grown children. Her former husband had departed this life approximately a year before. Defendant was then sixty-three years old, had been twice married and once divorced. He too had grown children and one daughter who was then sixteen years old but who married prior to date of trial, which occurred May 27, 1954.

Prior to the marriage plaintiff had operated a cafe and small motel near Buffalo, Missouri, which she had on the market for sale and which she did sell after the marriage. She testified that before the marriage she had had an opportunity to sell this property at a higher price than that received at the sale afterward, but in this she was not corroborated by any other evidence and the terms of such offer, with the exception of the end price, are not shown. Defendant was an auctioneer, cried sales in the country community and maintained an auction sale barn at Buffalo. He was also a trader in the sense that he bought and sold real and personal property and was the owner of various tracts of real estate which will be mentioned hereafter.

Plaintiff's petition was based on general indignities, several of which had their origin in unreasonable jealousy. Her testimony was that the defendant and consequently she, his wife, were the victims of extreme, oppressive and sometimes infantile jealousy on his part to the extent that she was denied normal social intercourse with her friends and acquaintances; that she was upbraided for going to the post office alone; that defendant's attitude was such as to cause her to resign from her social club in order to keep the peace, and thereafter the parties received no social visitors at the home except relatives. According to plaintiff, visits even by kinfolk occasionally provoked disapproval and ill language. Outbreaks and incidents of jealous temper and verbal abuse by defendant occurred on an average of once every two weeks. On these occasions defendant used vile language and sometimes told plaintiff that she could get out of his house and get a divorce. It would serve no purpose to relate and rehash all of these various incidents. Suffice it to say that plaintiff's testimony in regard to some of them was corroborated by the circumstances and even by seepage from defendant's testimony given in denial. There is no indication that plaintiff ever gave defendant cause for his intolerant jealousy.

On one occasion the plaintiff left defendant and went to the home of her son, where she stayed for a period of about five weeks. Defendant induced her to return, but the misconduct of defendant soon commenced again and finally culminated in a scene at night when defendant subjected the plaintiff to unreasonable complaints and accusations and to some physical abuse which caused her to suffer temporary hurts. Plaintiff left for good the next morning.

While plaintiff complains mightily of defendant's inordinate jealousy, she was not an innocent girl entirely unaware of her husband's disposition at the time the marriage was contracted. She said that she realized during courtship that he was extremely jealous but had hoped that the marriage would cure that. Even on the day of the marriage the defendant balked, literally, at the church door and threatened not to go through with the marriage because the ushering or some part of the arrangements was in the hands of a man whom he did not like.

With the exception of his obsession, defendant appears to have been a fond and affectionate husband. He provided for the plaintiff well. He took her about with him both on pleasure and on business. He sent and took her to beauty shops and made trips with her so that she might purchase cosmetics and might shop for clothes. Upon at least one occasion he picked out and bought a dress for her after she had exhibited some petulance with him for having sought to evade the wearing business of waiting for her to make her selection, by walking out to rest and smoke. He was anxious that his wife look nice and be well-groomed, and to this desire on his part plaintiff responded with true feminine enthusiasm.

One of the complaints of the defendant was that plaintiff indicated an undue interest in his property and his affairs and attempted to get him to put his property and bank account in their joint names. This defendant said he resisted because he felt that what she and her former husband had accumulated should go to her children and what he and his former wife had accumulated should go to his children with the exception of "a widow's dowry." On the other hand, plaintiff denied any beseechment in this respect except as applied to the home. She testified that she thought it proper that such be placed in their joint names. Defendant also testified that plaintiff interfered with his business affairs. He maintained his sale barn a short distance from the home. This was a large building wherein were pens for the housing of various animals to be offered for sale. He had a small platform upon which he stood while engaged in his auctioneering and a cream can upon which he sat when resting. The plaintiff frequently came over to this place while defendant was engaged in this work and defendant made room for her on his platform. The picture presented by de-

fendant's evidence is of the plaintiff, well-dressed and well made-up, sitting on a cream can amid the litter, sounds and smells of the auction barn, smoking cigarettes, whilst defendant hawked hogs, hardware and what-have-you, everything "outside of dogs." Defendant testified that he protested to plaintiff that she would be a lot better looking if she would leave off part of her makeup and lipstick and smoking in a crowd "where it was just purely men." Yet it appears that he was glad to have her join him and objected, if in fact he did object, not to her appearance in presence but her appearance cosmetically speaking. Plaintiff testified that defendant never objected to her being well-dressed or smoking cigarettes at the sale barn.

Prior to the final separation the parties had been married seventeen months and one week and, deducting the five weeks' separation, they had enjoyed each other's society in marriage for a period of approximately sixteen months.

As to the financial situation of the parties, at the time of trial plaintiff had approximately $9,500 cash in the bank, most of which was the net proceeds derived from the sale of her tourist court and cafe. She also owned an eighty-acre farm of the approximate value of $10,000 which had produced for her during the previous year, an admittedly drought-ridden period, share rental in the sum of $700. Defendant had various items of real estate, including the concrete block sale barn, the home where the parties lived, some other houses of varying age and value in and around Buffalo and a forty-acre tract, unimproved except for a cow shed, lying a short distance from town and along Highway 65. He also had some $3,300 cash in the bank. Defendant's testimony as to the worth of his properties is of no benefit to us because it plainly indicates that he was straining to compress such values. The plaintiff produced a real estate dealer witness as to the value of defendant's real estate holdings who gave them a total of approximately $44,225. Defendant produced a banker witness familiar with real estate values in the locality who gave them a value of

$24,000. In attempting to strike a middle ground between these two witnesses, and adding defendant's cash, we deduce that he was worth somewhere around $37,000, but this is at best an approximation. All of his property, as well as that of the plaintiff, was accumulated prior to the marriage. Plaintiff contributed nothing to the support of the family while they lived together, and financially it would appear that she left the marriage as well off as when she entered into it.

Appellant in her very thorough brief correctly states the law that we may not renounce our ultimate responsibility to examine the record, review the evidence and arrive at our own conclusion, Luckett v. Luckett, Mo.App., 263 S.W.2d 41; Padgett v. Padgett, Mo.App., 231 S.W.2d 207, 216; Lasswell v. Lasswell, Mo.App., 248 S.W.2d 47; but the rule of deference nevertheless exists and the allowance of alimony and attorney fees is a matter of sound discretion to be exercised with reference to established principles in view of all the circumstances of each particular case. Carr v. Carr, Mo., 232 S.W.2d 488, 490; Brinker v. Brinker, 360 Mo. 212, 227 S.W.2d 724, 726; Phillips v. Phillips, Mo.App., 219 S.W.2d 249, 272; Cadenhead v. Cadenhead, Mo.App., 265 S.W.2d 426, 437. In the absence of an arbitrary ruling or a manifest abuse of discretion, the determination made by the trial court is entitled to considerable respect. McCormack v. McCormack, Mo.App., 238 S.W.2d 858; Steinert v. Steinert, 215 Mo.App. 337, 250 S.W. 924; Stokes v. Stokes, Mo.App., 222 S.W.2d 108.

The statute, Section 452.070, RSMo 1949, V.A.M.S., provides that "the court shall make such order touching the alimony * * * as, from the circumstances of the parties and the nature of the case, *shall be reasonable*". While certain general principles apply, each case must be decided upon its own circumstances. It has been said that factors which almost invariably enter into consideration are the financial status of the respective parties, including the question of their individual estates,

incomes, obligations and necessities; the contribution of each to the accumulated property; the probable future prospects of each; their respective ages, health and ability to follow gainful occupations; their stations in life; their children, if any; the duration of the marriage, and whether it was one of affection or convenience; and the conduct of the parties, with particular regard to the cause of the divorce and the relative or comparative responsibility of each other therefor. Knebel v. Knebel, Mo.App., 189 S.W.2d 464; Phillips v. Phillips, supra; Simon v. Simon, Mo., 248 S.W.2d 560; Carr v. Carr, Mo., 232 S.W.2d 488, supra.

■ It has sometimes been said that the allowance of alimony is in the nature of an award for damages because of the husband's breach of the marriage contract. See Smith v. Smith, 350 Mo. 104, 164 S.W.2d 921; Driskill v. Driskill, Mo.App., 181 S.W.2d 1001, 1004; Nelson v. Nelson, 282 Mo. 412, 221 S.W. 1066; Brinker v. Brinker, 360 Mo. 212, 227 S.W.2d 724, 727. But the allowance of alimony is not mandatory. Smith v. Smith, supra; McCormack v. McCormack, supra; Stokes v. Stokes, supra. We must remember the wording of the statute, i. e., "as, from the circumstances of the parties and the nature of the case, shall be reasonable". While this is a statutory action, we apply equitable principles. Coggburn v. Coggburn, Mo.App., 256 S.W.2d 836; Fawkes v. Fawkes, Mo.App., 204 S.W.2d 132; State ex rel. Couplin v. Hostetter, 344 Mo. 770, 129 S.W.2d 1. In this instance, and under the circumstances of this case, we think the application of these principles required that plaintiff be restored, as nearly as might be, to status quo, that is, that she escape from the marriage without suffering financial loss and without attaining financial gain. The duration of the marriage was short. She was not the helpmeet during accumulation of defendant's property and has no children by him. She has suffered no appreciable diminution in her assets and no loss in the sense of broken health or impairment of faculties; nor has she suffered any physical pain or abuse except to slight extent in one or two instances. She is several years younger than her ex-husband and is apparently in good health. Defendant is in no better health than the average man of his age and no doubt has reached or passed the peak of his earning capacity. Plaintiff has means amounting to approximately $19,500. She has available cash to care for any immediate necessities and she obtained by the marriage and still retains her right of inchoate dower in her husband's property. This is a valuable right. While plaintiff in her brief argues ably that the ultimate realization on dower is a speculative thing and is therefore not entitled to much consideration, this court has more than once given considerable weight to this factor. Coggburn v. Coggburn, supra; Stokes v. Stokes, Mo.App., 222 S.W.2d 108, supra; Steinert v. Steinert, 215 Mo.App. 337, 250 S.W. 924, supra; Harris v. Harris, 208 Mo.App. 628, 235 S.W. 823. As stated, there is no question of need on the part of plaintiff now or in the immediate future. Defendant is a trader and, with the possible exception of the home and the sale barn, all of his real estate assets are "trading" properties. He cannot mortgage, trade or sell any of it without dealing with the plaintiff. All in all, we think that the value of the dower interest so acquired greatly exceeds any financial loss she may have suffered through necessity of employment of counsel and furtherance of this litigation. While we agree with the appellant that she should be reimbursed for any loss or damage suffered because of the marriage and its unfortunate dissolution, we believe also that she should not reasonably be expected to *profit* from such misadventure.

For the foregoing reasons we are unwilling to hold that the trial judge abused his discretion and the judgment is therefore affirmed.

McDOWELL, P. J., and STONE, J., concur.