Louise SHILKETT, Plaintiff-Appellant,

v.

Charles W. SHILKETT, Defendant-Respondent.

No. 7425.

Springfield Court of Appeals.

Missouri.

Dec. 16, 1955.

68

Roy Coyne, Joplin, Gerald Cohen, St. Louis, for plaintiff-appellant.

Emerson Foulke, Joplin, for defendant-respondent.

STONE, Judge.

During January, 1953, a decree was entered in the Circuit Court of Jasper County, Missouri, granting a divorce to plaintiff and directing defendant to pay $200 per month as alimony and $100 per month for support of a daughter, Carol, then sixteen years of age. On defendant's motion filed on June 19 and heard on September 28, 1954, the court modified the original decree by eliminating entirely as of October 1, 1954, the alimony of $200 per month. Plaintiff appeals.

At the outset, we emphasize the firmly-entrenched principles that a judgment for alimony, like any other judgment in an action at law, is res judicata as to all facts and conditions bearing upon the award and existing at the date of its rendition [Jourdan v. Jourdan, Mo.App., 251 S.W.2d 380, 382(3); Goldstein v. Goldstein, 237 Mo.App. 274, 165 S.W.2d 876, 879(4)—consult also Hurley v. Hurley, Mo.App., 284 S.W.2d 72; Lehr v. Lehr, Mo.App., 264 S.W.2d 35, 36(1); Shepard v. Shepard, Mo.App., 194 S.W.2d 319, 323 (3); Foster v. Foster, Mo.App., 146 S.W. 2d 849], and that authority for modification of a judgment for alimony is dependent upon proof of a subsequent change in conditions. Schulte v. Schulte, Mo., 140 S.W.2d 51, 54(5); Shapiro v. Shapiro, Mo.App., 238 S.W.2d 886, 889(1); State ex rel. Scott v. Harris, Mo.App., 136 S.W. 2d 78, 80(1); Couplin v. Couplin, Mo.App., 121 S.W.2d 186, 187(2). Of course, the burden of showing such change rests upon the movant. Samland v. Samland, Mo. App., 277 S.W.2d 880, 881(4); Seigfreid v. Seigfreid, Mo.App., 187 S.W.2d 768, 769(1).

The *only* change of condition alleged in the motion to modify or found by the trial court was a decrease in the net earnings derived from operation of the Rex Theatre in Joplin, Missouri, which was owned and operated by defendant as sole proprietor and, at all times herein material, has been his sole source of income. Defendant averred in his motion to modify that his "earning power" was $300 to $400 per month "at the time of the trial (in January, 1953) and for some time thereafter"; that, since June 1, 1953, his "earning power has decreased continuously";

that "during the latter part of 1953 his earnings were $100 per month or less"; and that, after January 1, 1954, "the operation of * defendant's place of business has been carried on at a loss" and defendant has had "no earning power." However, defendant's evidence was that, during 1952, the gross receipts of the Rex Theatre were $64,009.20 and the net income (after deduction of expenses, including depreciation of $1,991.02 which, although a proper accounting deduction, *was not a cash expenditure*) was $14,369.28, an average of $1,197.44 per month; that, during 1953, the gross receipts were $58,049.33 and the net income (after deduction of expenses, including depreciation of $1,502.81) was $13,273.68, an average of $1,106.14 per month; and that, from January 1 to July 31, 1954, the gross receipts were $25,982.16 and the net income (after deduction of expenses, including depreciation of $937.73) was $5,554.86, an average of $793.55 per month. *In 1953*, August, October and November were "the three best" months.

Defendant had no personal bank account but made withdrawals from the bank account of the Rex Theatre (hereinafter referred to as the Rex account) for "whatever I (defendant) need to pay my expenses." Defendant's personal withdrawals from the Rex account during 1952 aggregated $19,798.35, his personal withdrawals during 1953 (including $2,200 paid on his judgment liability of $3,300 for alimony and child support) aggregated $14,214.07, and his personal withdrawals for the first seven months of 1954 (including $650 paid on his judgment liability of $2,100 for alimony and child support) aggregated $4,706.13. Payments in the aggregate sum of $224.67 per month on notes for "capital expenditures" at the theatre before entry of the original decree in January, 1953, were included in defendant's personal withdrawals as shown above. In September, 1953, defendant executed another note, payable $50 per month, for an "ice cream machine" for the concession stand; but, as defendant agreed, this machine was "really paying

for itself" by increasing business so there was, after January, 1953, no *material* change of condition by reason of the monthly payments for "capital expenditures." The record before us is wholly silent as to the unpaid principal balance of, and as to the number of monthly installments remaining unpaid upon, any of the notes given for "capital expenditures."

The foregoing reflects the substance of the evidence pertaining to "decrease in the income from the Rex Theatre"; but, since other testimony was offered and received without objection, we shall discuss it briefly. At all times herein material, monthly payments of $50 each were being made from the Rex account on a note executed by defendant when he purchased a new Cadillac automobile in October, 1952, prior to entry of the original decree. Defendant's modest estimate of the cost of a two-weeks trip to Canada in his Cadillac during 1953 was $150 and his equally conservative estimate of the cost of "several" trips to Bull Shoals Lake in Arkansas was $20 each. During 1953, his rented home on a 60-acre tract seven miles south of Joplin was destroyed by fire and he lost all of his personal effects other than "the suit of clothes on my back." After receiving insurance of "$7,000 for about a $30,000 loss," he bought "a wardrobe," purchased the 60 acres for $3,000, and constructed a new home on it. The remainder of the construction cost of the new home was financed by a loan, apparently in the original principal sum of $9,000, on which monthly payments of $129 thereafter were made from the Rex account until August, 1954, when the principal of the loan was increased to $10,000 and defendant paid an "old income tax item" and some delinquent admission taxes. At the time of hearing, defendant had contracted to sell his new home to one Lee Smith for $17,000; and, in the judgment of modification subsequently entered on October 12, 1954, the trial court recited that the sale had been consummated and that, from the net proceeds thereof, defendant had reduced the delinquent alimony and child support under the original decree to $200.

Plaintiff resides in Webster Groves, Missouri, with her daughter and her mother. Plaintiff's mother, 73 years of age, who had a cerebral hemorrhage several years ago and is in very poor health, "has been living on a trust fund" which will be "used up" about 2½ years from the date of hearing, or in the early part of 1957. Plaintiff's daughter, enrolled as a freshman in Washington University at the time of hearing, will attain her majority in September, 1957, and the child support of $100 per month, which the trial court quite properly refused to modify, will (unless sooner terminated by the daughter's marriage) terminate then. Although not given the exact age of either party, we know, from the disclosure that the parties also have an adult son, that their marriage was one of many years' duration. Plaintiff, who (as defendant readily conceded) had been "very seriously sick" with tuberculosis and had "spent a great deal of her married life in institutions," testified without contradiction that, although "my health in the last two years has been fair," she "don't do too much," takes "the necessary rest," and at the time of hearing was "still under a doctor's care." Having attempted to work as a saleslady for a realty firm in Webster Groves for three or four months early in 1954, plaintiff "wasn't able to keep it up," did not obtain a license [Chapter 339, RSMo 1949, V.A.M.S.], and earned only $200.

During the Fall of 1952 (and thus prior to entry of the original decree), plaintiff and her mother purchased a home in Webster Groves. Plaintiff was not asked, and the record does not show, the amount of the purchase price or the down payment; but, plaintiff stated (and again without contradiction) that her mother "paid the down payment" and that title was taken in the joint names of herself and her mother "in case anything happened to either one." The home was subject to a loan of $14,500 payable $114.67 per month. It was developed that plaintiff had title to two automobiles, one of which was a 1952 Chevrolet said by plaintiff to have been "my mother's" and to have been subject to a loan of about $350 at the time of hearing, and the other of which was a 1949 Ford, "a (high school) graduation gift to my daughter from my mother," used by the daughter in "a driving pool" for transportation to school, and registered in plaintiff's name because the daughter was a minor. The only income which plaintiff was shown to have, other than payments by defendant under the original decree, was [as "I (plaintiff) testified * when we got the divorce"] $1,000 per year from dividends on unidentified stock, the reasonable market value of which was not suggested.

We recognize that, as defendant urges, allowance of alimony to a wife, to whom a divorce is granted, is not mandatory [Smith v. Smith, 350 Mo. 104, 164 S.W.2d 921, 923(3); Simmons v. Simmons, Mo.App., 280 S.W.2d 877, 881(4); Baker v. Baker, Mo.App., 274 S.W.2d 322, 324(1)], and that, under our present concept of alimony, a divorced wife, who is capable of assisting herself, has no right to insist that her husband maintain her in idleness and luxury, simply because he has been adjudged the guilty party. Stokes v. Stokes, Mo.App., 222 S.W.2d 108, 113; Schwent v. Schwent, Mo.App., 209 S.W.2d 546, 547(1); Knebel v. Knebel, Mo.App., 189 S.W.2d 464, 468. Nevertheless, it has been said repeatedly that the allowance of alimony is in the nature of an award of damages because of the husband's breach of the marriage contract [Brinker v. Brinker, 360 Mo. 212, 227 S.W.2d 724, 726–727(4); Schulte v. Schulte, supra, 140 S.W.2d loc. cit. 54; Nelson v. Nelson, 282 Mo. 412, 221 S.W. 1066, 1068–1069(7); Driskill v. Driskill, Mo.App., 181 S.W.2d 1001, 1004 (4); Anderson v. Anderson, Mo.App., 142 S.W.2d 1082, 1083]; and, although the question as to whether alimony should be granted in any given case must be determined in the light of the particular circumstances of that action [Simon v. Simon, Mo., 248 S.W.2d 560, 568(7); Knebel v. Knebel, supra, 189 S.W.2d loc. cit. 467–468(6,7)], alimony ordinarily should be allowed to an innocent and injured wife, "in the interest of social wel-

fare and justice," where it is reasonable to do so. Smith v. Smith, supra, 164 S.W. 2d loc. cit. 923–924; McCormack v. Mc-Cormack, Mo.App., 238 S.W.2d 858, 862–863(5). "An award of alimony * * is based on the principle that it is the statutory duty of the husband, in so far as he is able, to contribute such amount as will, supplemented by the wife's earnings and other income, enable her to live according to the station in life which she enjoyed when the decree of divorce was granted." Harriman v. Harriman, Mo. App., 281 S.W.2d 566, 570.

■ In the instant case, defendant complains that *"the original judgment * * utterly disregards the condition and circumstances of both parties."* But, *even if* the evidence taken on the motion to modify were adequate (*and it is not*) to admit of an intelligent and informed conclusion as to whether the original award of $200 per month was excessive, neither the trial judge in the first instance, nor this court on appeal from the judgment of modification, would have license or right to review the unappealed decree originally entered following trial in January, 1953. For, as we emphasized at the outset, the original decree was res judicata as to all then existing facts and conditions bearing upon the alimony awarded, and authority for modification is dependent upon proof of a subsequent change in conditions. Reduced to its simplest terms, the sole question for our determination is whether, *after entry of the original decree in January, 1953,* defendant's income so decreased as to justify complete elimination of the original alimony award. And assuming (as we must and do) that the original award of $200 per month was entered in the exercise of sound judicial discretion "with

reference to established principles and upon a view of all the circumstances of (the) particular case". [Carr v. Carr, Mo., 232 S.W.2d 488, 490(5)], we are unable and unwilling to say (as would be necessary for affirmance of the judgment of modification) that the *sole* change of condition within the scope of defendant's motion to modify and demonstrated by the record before us, i. e., a reduction of approximately 34% in defendant's income from $1,197.44 per month during 1952 to $793.55 per month during the first seven months of 1954, affords the required evidentiary support for a judgment which "modified" the original alimony award by altogether relieving defendant of any obligation to make further payments toward the support of his former wife, who has a long history of illness and frailty, is not shown to be physically capable of steady employment now (to say nothing of the future), and has been adjudged to be the innocent and injured party.

■ Of course, the amount of alimony to be allowed upon a motion to modify is no more susceptible of precise and exact determination by application of any hard and fast rule [Stokes v. Stokes, supra, 222 S.W.2d loc. cit. 111(2)], definite standard or "yard-stick" [Bittel v. Bittel, Mo.App., 147 S.W.2d 139, 140(2)] or fixed formula [Burtrum v. Burtrum, Mo.App., 210 S.W.2d 364, 373] than is the amount to be allowed in the first instance. But, an examination of numerous cases [1] indicates that, in ruling motions to modify, the courts frequently have thought that "the amount to be paid as alimony is not to be reduced in the same proportion the (husband's) salary has been reduced, for the simple reason the (wife's) necessities remain the same regardless of his income" [Bittel v. Bittel,

1. In Altenbach v. Altenbach, Mo.App., 162 S.W.2d 361, 362–363(3), the husband's income was reduced about 30% while the alimony allowance was reduced 25%; in Bittel v. Bittel, Mo.App., 147 S.W.2d 139, the income reduction was about 44.4% but the alimony reduction was only 26.7%; in Hayes v. Hayes, Mo.App., 75 S.W.2d 614, the income reduction was not less than 42.8% while the reduction in the combined allowances for alimony and child support was about 40%; in Salkey v. Salkey, Mo.App., 80 S.W.2d 735, 739(1), the income reduction was 30% but the child support reduction was only 16.7%; and, in Seigfreid v. Seigfreid, Mo.App., 187 S.W.2d 768, 769(5), an income reduction of about 30% was held to have justified no reduction in the allowances for alimony and child support.

supra, 147 S.W.2d loc. cit. 141], although this is not to say that, upon retrial of this case, the trial court is to be thus strictly restricted and limited, for it is well to re-iterate that each case presents its own peculiar problems and must be decided on its own particular facts. Knebel v. Knebel, supra, 189 S.W.2d loc. cit. 467(6).

We are not unmindful of defendant's financial troubles, climaxed by the filing of a lien against the Rex account in the Summer of 1954 for delinquent income taxes. But, these difficulties would seem to have been largely of defendant's own making, apparently spawned in his improvident withdrawal from the Rex account in 1952 (*prior to entry of the original decree*) of $5,429.07 more than the actual net income of the business during that year, and matured by his equally improvident failure to discharge his current tax liabilities out of such withdrawals. With no purpose or desire to compound trouble or tragedy for defendant, we nevertheless are not prepared to hold, either expressly or in effect, that a husband may, by the simple expedient of becoming entangled financially whether by improvidence or otherwise, shed with impunity his previously adjudged responsibility to an innocent and injured wife.

 We should be and are inclined to defer to the findings of the trial court where sharply conflicting evidence does not preponderate one way or the other. Lockhart v. Lockhart, Mo.App., 271 S.W. 2d 208, 212–213(3); Luckett v. Luckett, Mo.App., 263 S.W.2d 41, 44(4); Beldt v. Beldt, Mo.App., 240 S.W.2d 983, 990(2). However, the reason for the rule in large measure fails where, as here, there is no material conflict in the testimony [Schulte v. Schulte, supra, 140 S.W.2d loc. cit. 54 (8)]; and, in any event, it is our duty, upon this review de novo, to determine the right and justice of the matters in controversy. Coggburn v. Coggburn, Mo. App., 256 S.W.2d 836, 839(2); Jourdan v. Jourdan, supra, 251 S.W.2d loc. cit. 382 (1); Bowzer v. Bowzer, 236 Mo.App. 514, 155 S.W.2d 530, 532(2). Reluctant as we are to differ with the distinguished trial judge, appellate review would become an empty formality and we would be unworthy of the trust reposed in us, if we yielded our firm convictions simply because he, with an equal sense of justice, found differently. Campbell v. Campbell, Mo.App., 281 S.W.2d 314, 319, and cases there cited.

Upon the grossly inadequate record presented, any attempt on our part to fix the amount to which the original alimony award properly might be modified would, of necessity, be arbitrary; and, we believe that, upon retrial, counsel can develop additional information, including reliable data (perhaps from actual income tax returns) as to defendant's income for the full years of 1954 and 1955, which will furnish a more accurate factual basis for whatever judgment the trial court may enter. Simon v. Simon, supra, 248 S.W.2d loc. cit. 568(8). Accordingly, the judgment of modification entered on October 12, 1954, is set aside and the cause is remanded for retrial and further proceedings not inconsistent with the views expressed herein.

McDOWELL, P. J., and RUARK, J., concur.