Marie C. FARIS, James W. Faris, William B. Faris, Mary Lee Faris, Adalyn Faris Moore, Hellen Faris Meyers, Carolyn Faris Wheeler, Robert Lee Faris, Jr., Elizabeth Faris Schlarb, Lisbeth Williams Faris, Charles William Faris and Carolyn Faris, Plaintiffs-Appellants,

v.

The CITY OF CARUTHERSVILLE, a municipal corporation, Defendant-Respondent.

No. 7491.

Springfield Court of Appeals.

Missouri.

March 22, 1957.

James W. Faris, Jefferson City, Don Kennedy, Nevada, for plaintiffs.

Ward & Reeves, Caruthersville, for defendant.

RUARK, Judge.

This is an appeal from a judgment of the circuit court which upheld the validity of an extension of the city limits of Caruthersville. In 1948 the city council submitted to the electorate, and the voters approved, a proposition for the annexation of four tracts. The largest of these tracts appears to be one of 51.3 acres located immediately adjacent to the northwest corner of the city limits, and it is this tract over which the battle rages. On June 26, 1950, the owners brought suit to have the ordinance and consequent annexation declared invalid because such was arbitrary, unreasonable and oppressive and worked a fraud on the owners. Thereafter the suit apparently lay dormant until December 17, 1954, when it was tried, and, judgment being rendered against the owners, they have appealed.

Caruthersville is a city of the third class which lies and preens itself behind the levee of the Mississippi River, which river runs in a slight curve along the north and northeastern boundary of the city. The present corporate limits, including the area annexed, are irregular. The most nearly we can describe the outside boundary is that it is somewhat in the shape of a flying squirrel lying with its head in the slight curve of the river and the extended wings on either side running along the levee to the right and left, the body and tail extending south. The plat which follows shows the 51.3 acres in question here in relation to the extreme northwest corner of the city prior to annexation, which portion of the city, together with the annexed area, makes up the left wing of the flying squirrel. The tract in question is part of a 342-acre farm which lies immediately adjoining the west side of the city. Prior to the annexation a portion of the city, that shown on the plat as the fairgrounds, stuck out into the east side of this farm like a fat, stubby thumb. A fragment of the land taken encircles the fairgrounds and makes the city boundary in that vicinity somewhat more regular. The tract annexed is bounded on its west side by what is called "the old Hayti gravel road." Immediately to the east of the annexed land is a blacktopped city street on the old city boundary line. Crossing the south portion is a freight line of the St. Louis-San Francisco Railway, and the north boundary is the Mississippi River levee. Running across the north one-third of the tract is a paved highway (Missouri No. 84). Thus, the greater portion of the tract is enclosed by a gravel road on the west, by city streets on the east, by a railroad on the south and the river on the north, and it is bisected by a state highway. This highway is one of the main trafficways in and out of the city. After crossing the tract in question and extending further to the east it becomes West Third Avenue, which is one of the main business thoroughfares of the city running east and west. The land along both sides of this highway inside the city is largely taken up with business and commercial establishments, and we gather from the evidence that farther west of town, after the highway leaves plaintiffs' land, there are also some commercial or business establishments along this highway. Northeast of this highway is a narrow strip of land (a part of the annexed tract) running between the highway and the levee. On approximately two acres of this strip north of the highway is located an oil storage tank yard owned by the Refiners Relay, Inc., which has pipelines across the levee in order to receive oil from river barges. Across the levee from the northeast corner is a busy ferry landing with a road or street which connects with the highway and with the street running down the east side of the tract in question. (See map.)

The principal portion of the so-called industrial section of Caruthersville lies along or near to the river and in the northeast part of the city. The principal north and south street is Ward Avenue, which runs through the center of the city. On it are located a good many commercial or business establishments. West Third Street (Highway 84) connects with Ward Avenue about ten blocks east of plaintiffs' land.

By the 1940 census Caruthersville harbored some 6,612 souls. Commencing with the end of World War II (and we suspect good crops and prices for cotton) the city experienced considerable expansion of activity and population growth. By 1950 the population was more than 8,600. (One witness intimated that "more people live on the alleys than on the front of the lots.") Subdividing and home building increased with the pressure of added population. Between 1945 and date of trial at least eleven subdivisions for residential purposes were developed and substantially built upon. Most of this residential growth has been to the south. In 1950, since the extension which is the bone of contention in this lawsuit, a further annexation was made to take in a small additional tract on the south end of the city. This tract has also been platted and substantially filled with residences.

As bearing upon the need for additional land, plaintiffs produced evidence of several small unplatted, or partially platted, tracts in the city. One was a triangular piece of ground located in the southeast portion of the city. This tract contained twenty-two or twenty-three acres and was partly platted. As to the suitability and availability of this tract for development the evidence is not sufficient to enlighten us. Another tract was comprised of about twenty acres on the east side of the city, the site of a former oil mill, of which about two acres was occupied by a junk yard. There was also evidence of several smaller unoccupied tracts of varying sizes. It does not appear that any of the tracts so mentioned were located on the river.

Some of them have available railroad facilities; some of them do not.

As bearing upon the need for space for residences, the plaintiffs produced a list of 212 lots which were vacant within the city at the time of the annexation in 1948. It appears from the evidence that some of these lots were used for parking purposes; some of them were church or lodge property; some were adjacent to a drainage ditch. A number of others were improved with residences after 1948 and prior to trial of the case. As to just how many of these vacant lots which were suitable for residential or business construction remained at the time of trial in 1954 we would not hazard a guess.

The land over which the controversy arises is a part of a larger farm and, with the exception of the small tract previously sold off to the Refiners Relay north of the highway, has been devoted exclusively to farming for a great many years. The only structures upon the land in question are four buildings which were referred to as "shacks," occupied by laborers on the farm. The land contains no utility lines, and for so long as used for farm purposes there is need for none, nor is there developed area to the west which requires such utilities. The land appears to be quite valuable for farming purposes. One of the owners testified that it was held and kept as a part of the farm and for the income derived from its operation as a farm, and that there was no desire or intention to apply it to or hold it for sale for any other purpose. The land itself is sometimes subject to seeps from the pressure of the river, which the owners contend make the land undesirable for development purposes. But this condition of seepage, under certain circumstances, appears to be common to the area along the levee, including portions of the main business district within the city. Under the bulk of the evidence, plaintiffs' land was worth from $400 to $500 per acre for farming purposes, but has a value in excess of $1,000 for development, residential, business or commercial purposes. One of the owners

testified that he had repulsed a proposed offer of $1,000 per acre for twenty acres. He stated that the owners could not afford to accept such a price and pay the income tax on the capital gain which would result from such sale, but that, in any event, the family desired to retain the land for farming purposes and not devote it to any business or commercial use. The record is too voluminous to more than summarize the effect of the evidence. A number of witnesses testified as to the suitability and desirability of this property and practicability of its use for city purposes. Some of them placed a greater value upon it for residential development. Others were of the opinion that it was most desirable for commercial or industrial usage; and witnesses for plaintiffs testified to the contrary. If we accord even half the witnesses with the quality of reasonableness, there was room for reasonable men to disagree. As stated in appellants' brief, "The city's need for this property to accommodate a growing population and industrial expansion is a controverted issue."

The appellants must pull the laboring oar. In cases of this character we try the case de novo and arrive at our own conclusion as to the result; nevertheless where and in so far as questions of credibility are concerned, and hence sometimes the weight to be given to the testimony of various witnesses, we defer to some extent to the appraisal made by the trial judge. Most important, however, is that the procedure which culminated in annexation is presumed to be reasonable and valid. The city council in determining the necessity for annexation is given a broad grant of discretionary power, § 77.020 RSMo 1949, V.A. M.S., and the courts will not interfere with the performance of this function unless it plainly appears that the exercise of such discretion was arbitrary and unreasonable. It is the plaintiffs' burden to show this. Waller v. City of Macon, Mo.App., 277 S.W.2d 886, and cases cited. In making our determination we will not look too closely into mere matters of judgment, and where the question is fairly debatable and there is room for reasonable difference of opinion the court will not substitute its judgment for those who possess the right, duty and responsibility in the first instance. Dressel v. City of Crestwood, Mo.App., 257 S.W.2d 236, and cases cited at loc. cit. 248; Hislop v. City of Joplin, 250 Mo. 588, 157 S.W. 625. And if the unreasonableness claimed is that too much land was taken, such inclusion becomes unreasonable only " 'if the excess be such as, in effect, to evidence an attempted fraud upon the law.' " State ex inf. Major v. Kansas City, 233 Mo. 162, 134 S.W. 1007, 1024.

State ex inf. Major v. Kansas City, supra, is the leading case on the reasonableness of annexation and will be found cited in most of the subsequent decisions. This case accepted and adopted as a guide for inquiry into such reasonableness five affirmative and two negative factors which should be considered. We shall not set them out in full. Those which most concern us here we attempt to reduce to the one statement that annexation will be upheld when (a) the lands are needed for any proper city purpose, such as extension of its streets or utilities or police or fire protection, *or to supply places of abode or business for its residents,* and (b) when the lands so to be annexed have added or greater value by reason of their adaptability to city use.

Taking the second of these propositions first, it seems beyond dispute that this land, although it is exclusively devoted to agricultural use (with the exception of two acres sold off for an oil storage site) and is valuable for such purposes, and although the owners desire to devote it solely to that purpose, has much greater value because of its proximity to the city *and* its adaptability for city purposes. No witness gave the land a value in excess of $500 (per acre) for farming purposes. On the other hand, the overwhelming weight of the evidence is that its value for city development is in excess of twice that sum. The reasons for this are accessibility to a railroad, a busy highway which has already grown into a busy street,

accessibility to the river and river traffic, accessibility to city streets, and the availability of all city facilities and labor supply. It is clear that the greatest value of the land does not lie in its fertility as a farm. It is equally clear that its actual value would not be as great as it is if such land were situate a distance from a city and so did not have the various facilities available for transformation into a residential, business or industrial site.

 As to the question of the needs of the city: In performing their function to exercise their discretion in determining the need for physical expansion the city fathers are not limited to a consideration of only immediate or pressing needs. They have the right and the duty to take cognizance of the future and to provide for such needs as it reasonably appears the foreseeable future will bring. As to just how far they may consider the future, no hard or fast rule can be drawn. Purely speculative assumptions based upon hopeful dreams of future grandeur rather than upon hard reality are not sufficient. But to peer into the future requires a look over the shoulder at the past. See Ozier v. City of Sheldon, Mo.App., 218 S.W.2d 133, 137; State ex inf. Major v. Kansas City, supra, 134 S.W. 1007. The expansion and rate of growth during the immediate past furnishes some criterion by which to judge the immediate future, for the expansion needs of a stagnant city with a static population would not be the same as those of a city with an expanding economy and a growing population. In this instance the population has been increasing, the city has been expanding, new subdivisions are being laid out and built upon. The river front within the present city limits appears to be completely occupied. The presence of some lots and of some irregular shaped platted or unplatted tracts located in the eastern or southern part of the city, which are yet unoccupied or only partially occupied, is a factor to be considered; but none of these tracts is in any wise near the size of the tract in question, nor are they shown to be available, or as adaptable or

aided with the combination of water, rail and highway accessibility. The city is not to be barred from expansion solely because it may yet have some undeveloped tracts and has not completely outgrown its original limits. Mauzy v. City of Pagedale, Mo. App., 260 S.W.2d 860; Dressel v. City of Crestwood, supra, 257 S.W.2d 236. Because the people will not build within a certain area, we cannot say that the city is foreclosed from annexing other adjacent territory. The city council should not attempt to control the direction of its growth nor the location of the people's homes or businesses. State ex inf. Mallett ex rel. Womack v. City of Joplin, 332 Mo. 1193, 62 S.W.2d 393. We conclude that the need for this tract was a question over which a council of practical minded and sincerely purposed men of good judgment might reasonably differ and, having differed, argue out their differences and reasonably determine in the affirmative. Such being the case, our judicial authority is exhausted and we cannot substitute our judgment for that of those whose function it is to make the determination and say that they exercised their discretion arbitrarily.

 In passing upon this question we have considered the pronouncement in respect to the two negative factors which are said to inhibit annexation, as mentioned in State ex inf. Major v. Kansas City, supra, 134 S.W. 1007:

> " '(1) when they are used only for purposes of agriculture or horticulture, and are valuable on account of such use; (2) when they are vacant and do not derive special value from their adaptability for city uses.' "

If this language is to be read and applied *strictly,* and the two negative factors are to be taken in the disjunctive, then no valuable agricultural or horticultural land could *ever* be taken and devoted to city uses. We note that in Bingle v. City of Richmond Heights, Mo.App., 68 S.W.2d 866, loc. cit. 867, the court states that if any one of the five positive tests applies, then annexation ordi-

nances may be upheld, provided that the facts found to exist do not bring the case within the prohibition of *either* of the two negative tests. But the same court which originally brought this rule into Missouri upheld the annexation of land, part of which had value for agricultural and horticultural use, and such court, 134 S.W. at loc. cit. 1027, called attention to the fact that the value of the land in respect to adaptability to city purposes had a value far in excess of that of any agricultural or pasture land, no matter how favorably situated. We find a number of cases which uphold annexation although the land in controversy had value for agricultural purposes. We conclude that the "value" set forth in the second negative factor of the rule is a comparative value in relation to the value which the land has because of its adaptability to city purposes. As was said in City of Sugar Creek, Mo. v. Standard Oil Co., 8 Cir., 163 F.2d 320, 323, the considerations named are not legal absolutes in the sense that one of them is conclusive of reasonableness. The test of reasonableness must of necessity be a flexible one. Jones v. City of Clayton, Mo. App., 7 S.W.2d 1022. It appears to us that all considerations and all factors must be weighed and balanced against each other, and if the conclusion arrived at by the city council was one which reasonable men could arrive at, the courts may not interfere.

■ Appellants argue that since the owners are devoting the land exclusively to farming, do not hold it for sale or development on city values or any other value, and do not intend to permit its use to any purpose except farming, then such land is not "available" for city uses; hence the only purpose accomplished by annexation is to burden the land with city taxes, while conferring no benefit upon either the land or the city. If the land were so situate, either physically or legally, that it could *never* become available for use for city purposes, then it would not be "adaptable" for such within the meaning of the law. But we think nonavailability dependent upon the owners' wish, sentiment or intention is not the criterion. True, the plans of the owners are entitled to consideration, but they cannot in and of themselves alone balance the scales against the necessities of the community; and who knows—tomorrow if the price is suitable the owners may change their minds.

The judgment is affirmed.

McDOWELL, P. J., and STONE, J., concur.