**CITY OF ST. PETERS, Missouri, a Municipal Corporation, Plaintiff-Appellant,**

v.

**Gregory KUESTER et al., Defendants-Respondents.**

No. 32353.

St. Louis Court of Appeals.

Missouri.

March 15, 1966.

Rehearing Denied April 12, 1966.

Niedner, Niedner & Moerschel, St. Charles, for plaintiff-appellant.

Louis S. Czech, Clayton, for defendants-respondents.

BRADY, Commissioner.

Appellant brought an action for a declaratory judgment as provided by § 71.015, RSMo 1959, V.A.M.S. (commonly known as the "Sawyers Act"), authorizing it to hold an election on the issue as to whether its corporate boundaries should be extended. The trial court denied appellant the relief it sought and dismissed its action with prejudice. We will refer to the appellant as "the city" and to the respondents by their designation in the trial court or by their individual names.

It is our duty to review the case de novo reaching our own conclusions with respect to the law and the facts, but granting due deference to the finding of the trial court where the credibility of witnesses is involved. City of St. Ann v. Buschard, Mo. App., 356 S.W.2d 567.

Most of the facts are undisputed. The city has an area of 160 acres with a population of 450. The unincorporated area sought to be annexed consists of 220 acres and has a population of 600. The city existed as a village from 1910 until 1959 when it was incorporated as a fourth class city. It has the usual commercial establishments including a bank and a railroad station. About two-thirds of the city's area lies and the greater part of its population lives on the north side of U.S. Interstate Highway 70, a four lane, divided, limited access highway. At the time of trial there were two roads which crossed the highway but these were soon to be closed and replaced with a single overpass. South of the highway the city consists mainly of a Catholic Church and its auxiliary buildings. The topography of the area is such that the city is hemmed in by Dardenne Creek on the west, by the Wabash Railroad on the north, and by a grain elevator area on the east. The logical course of expansion lies to the south.

There was extensive testimony as to the present government in the city. From this it appears that there is no city hall and space is rented for that purpose at the volunteer fire hall. There is no telephone service to the city. Its police department is headed by one of the aldermen who serves as "police commissioner." His office was established by the city after this action was filed. There is a part-time police officer who has a regular place of business in the City of St. Charles, some miles away but who is available in the city in the evenings and at night. He has no separate telephone listing. A witness testified that he was tending bar in a tavern in the city when a patron became drunk and disorderly. The mayor of the city, who also was in the bar at the time, attempted to call the city marshal. The marshal had no one to relieve him at his business so he couldn't come and take care of the drunken patron. The city frankly admits that the part-time officer has not always been available when he has been called and that the police service for the city is inadequate.

There is no police car. The city has resolved to expand its police department but has not developed any actual cost figures or plans for doing so.

Assessed valuation in the city has increased from $357,000.00 in 1959 to $550,000.00 at present. The tax rate is 45 cents for $100.00 evaluation for general purposes and $1.40 for waterworks bonds which now have an outstanding balance of $63,000.00. The tax rate and bonded indebtedness have steadily increased during the rise in assessed valuation. There was testimony that the tax rate necessary to retire the waterworks bonds could be reduced if annexation were permitted due to a broader base. There was evidence that these tax rates had been set by motion rather than by ordinance during the three years prior to trial. From February, 1962 until June, 1964 only four ordinances were proposed and passed.

The city has no street department, but the city streets are generally paved and lighted and there are some sidewalks. However, the city has constructed no new streets within the four years preceding trial and no sidewalks within the ten years preceding trial. It has no street employees or street equipment and the main street of the city is maintained by the state and county highway departments. Other streets within the city connect with and form a part of county roads and are maintained by St. Charles County.

The city has no municipally owned fire department, but a fire hall with two radio equipped trucks is located within the city and manned by volunteer firemen, two-thirds of whom are city residents. The fire hall is owned by the volunteer fire department and the services of that organization are available to dues paying members within the city and also to those living in the area the city seeks to annex.

The city's water system can produce over 200,000 gallons per day and is adequate to serve more than 1,000 people for both domestic use and fire protection. The system has two deep wells, a 50,000 gallon elevated storage tank, and 14,000 feet of water mains which can readily be connected with the existing private water system in a portion of the area to be annexed. The city had entered into an agreement with the private water company serving a portion of the area to be annexed to augment the water supply of that area with some water from the city. The city's water is from deep wells and untreated. It has a noticeable mineral content and to many persons is unpalatable without the use of water softening equipment. The public school attended by residents of both the city and the unincorporated area is supplied with water from the city. The janitor and maintenance man at the public school testified that the city water has an odor to it and the children complain about it. He also testified that a water softener was necessary to make the water palatable and to avoid such complaints. The cooks at the school bring their own water to use in cooking instead of being forced to use the city's water. This is due to the taste of the water and the fact it discolors utensils. There was also testimony that the city's water ran under inadequate pressure causing difficulties as to toilet flushing.

The city sewage is handled by individual septic tanks. It does not have a sanitary sewer system and the testimony was that this was not financially feasible under its present circumstances. It has employed an engineer who has presented preliminary plans of a system designed to serve both the city and the area to be annexed.

With reference to park facilities and to schools the evidence was that the only public recreational facility in the area is a park located within the city and owned by the Chamber of Commerce of the city which is presently used and maintained by residents of both the city and the area to be annexed. The parochial school is located in the city and the elementary public school serving both the city and the unincorporated area is located in the unincorporated area.

The city has an unpaid "building commissioner" who is also one of the aldermen

who issues building permits and inspects septic tanks. It does not have any building, electrical, fire or zoning code, dog control or library ordinance. Neither does it have a public health ordinance other than the requirement for septic tank inspection.

There was some dispute in the testimony as to the availability of vacant building lots within the present boundaries of the city. The city's testimony was that there were twelve acres of vacant ground within the city as presently constituted and that there were some scattered lots within the town including three located immediately off of the main street. The defendants' evidence was that there were 22.42 acres of vacant land within the city as presently constituted and there were a total of 23 vacant lots. As of the date of trial the city admitted that there had been no applications for building permits on any vacant lots in the city.

With reference to the area which the city seeks to annex the facts are that it is substantially developed and contains extensive subdivisions. The remainder of the land not plotted into subdivisions has been built up by individual home owners with the exception of one large tract of land known as "the McMenamy tract." The public school which lies within the area the city seeks to annex is at the southwest corner of the McMenamy tract. The best use of this tract of land is for residential purposes as it is benefited by the existence of city water which runs past it to the school and also by its proximity to the city. This tract comprises the eastern portion of the area to be annexed. In the approximate center of the area the city seeks to annex there is a rectangular portion of some forty acres which adjoins the city's present south boundary. A subdivision known as "St. Peters Estates" containing about sixty homes is at the eastern half of this central area. The rest of the central area is vacant land but is suitable for residential development. Immediately to the south of the central part of the area sought to be annexed lies an unincorporated subdivision consisting of some 360 homes known as "Steeple-chase Subdivision." Steeplechase does not lie within the area which the city seeks to annex. At the western end of the area which the city seeks to annex is a rough rectangular tract containing about forty homes in a subdivision known as "St. Mary's Subdivision" and about ten homes in another subdivision known as "Cottage Hills." Land values in the unincorporated area have risen from $1,500.00 to $2,000.00 an acre to a present range of $2,000.00 to $5,-000.00 an acre.

Police protection available to the unincorporated area is that given from the state highway patrol and the county sheriff's office. Testimony was that the county sheriff's office maintains a dispatcher and four cars patrol throughout the county at all times. The subdivisions lying within the unincorporated area are patrolled a minimum of once a day and sometimes as many as four times in a given evening. Their officers have received F.B.I. training, they attend weekly schools, and they have attended the state patrol academy. The sheriff's office is listed in the telephone book and the time to answer a call from any given area is fifteen minutes. One witness testified that he lived in the area which the city seeks to annex and had occasion to call upon the sheriff for protection and the sheriff had deputies at his residence within four to five minutes of his call. The sheriff of St. Charles County testified that his office presently provides police protection to the residents of the city. His office patrols the city at the same frequency as it does the area sought to be annexed and his officers actually walk and check the front doors of the business houses in the city at night. It was his opinion and it was also the opinion of Lt. Maxey of the Missouri State Highway Patrol that the city has inadequate police protection.

St. Charles County maintains most of the streets and roads in the area the city seeks to annex. These are of concrete asphaltic surfacing and most are 35 feet in width with a 60 foot right of way. There are some streets 28 feet wide. The main road

in the area which the city seeks to annex and the streets in St. Peters Estates are well paved. The streets in St. Mary's Subdivision are oiled and those in Cottage Hills have crushed rock surfacing. None are lighted and there are no sidewalks. There is no way to compel private contribution toward road or street maintenance in the unincorporated area, and the county's funds for this purpose are limited with the result that some requests made by residents of the unincorporated area for work on the streets in the subdivisions have been refused. The county has provided street signs and does the weed cutting in the unincorporated area. Testimony was that the streets lying within St. Peters Estates were in much better condition and much better built than the streets located within the city.

With reference to water and sewer facilities in the unincorporated area the testimony was that the developer of Steeplechase Subdivision had organized the St. Peters sewer and water companies. The St. Peters Water Company has a 50,000 gallon storage tank, a 4,000 gallon pressure tank, a high service pump that pumps 150 gallons per minute and a four gallons per minute fire pump. The protection is adequate for fire as well as home usage. The system is designed for a capacity of 530 homes and is presently serving 406 homes. It has been in existence since December of 1959. The water from their wells does not have a bad taste, does not discolor the utensils and the people who utilize it do not require water softeners. The water rates are about one-third cheaper than the city's water rates. At the date of trial the system was pumping some 220,000 gallons per day and the capacity of the present system was 300,000 gallons. The St. Peters Sewer Company's lagoon is 7½ acres in size and located on a twenty-acre tract. It provides sewer services for Steeplechase Subdivision, for St. Peters Estates Subdivision, and for private residents located on the main county road going through the unincorporated area.

There was testimony that the services received in the unincorporated area were satisfactory; that 95 per cent of the roads in the unincorporated area are in good shape; and that residents of the unincorporated area would receive no benefits from the annexation.

The testimony also was that the residents of the unincorporated area now receive benefits such as zoning, mosquito and insect spraying, building ordinances, sewers in some areas, and health services which the city does not provide. Upon a complaint being made about the presence of rats in the city the complainant was informed that nothing could be done about it by the city.

■ Whether or not a city should annex contiguous, unincorporated territory is a legislative decision. We are not authorized to substitute our judgment for that of the city's governing board, whose decision as to that matter must be sustained unless it was arbitrarily or clearly unreasonably made. City of St. Joseph v. Hankinson, Mo., 312 S.W.2d 4(7, 8); City of Lexington v. Shepard, Mo.App., 344 S.W.2d 308(1). The rules or guides which have been stated in the cases merely constitute factors of which the court should be cognizant. Each of these factors is to be considered in relation to the others, none of them is necessarily controlling. No fixed formulae can be stated, each case standing upon its own facts. City of Aurora v. Empire Dist. Electric Co., Mo.App., 354 S.W.2d 45, 1. c. 48.

Section 71.015, supra, requires the city to state the area to be annexed, that such annexation is reasonable and necessary to the proper development of the city, and the ability of the city to furnish normal municipal services of said city to said unincorporated area within a reasonable time after the annexation becomes effective. The city has the burden of proof as to these matters. Section 71.015, supra, and cases collected at n. 3. There is no issue here as to the city's bearing of its burden as to the first require-

ment and, as will later appear, we do not reach the third requirement. The general issue here involved is whether the city carried its burden as to the second requirement.

◼ It has been held that the words "to the proper development of said city" as found in § 71.015, subd. 2, supra, do not limit judicial inquiry as to reasonableness of the proposed annexation to the standpoint of the city alone. City of Olivette v. Graeler, Mo., 338 S.W.2d 827, 1. c. 836–837. Both the city and the residents of the area to be annexed are entitled to a judicial inquiry into the reasonableness of the annexation. If this were not so, the Sawyers Act might be vulnerable to an attack upon constitutional grounds. City of Olivette v. Graeler, supra; City of Woodson Terrace v. Herklotz, Mo.App., 349 S.W.2d 446, 1. c. 451.

◼ The rule is that, as to showing the reasonableness of the annexation from the standpoint of the city, the city carries its burden when proof is presented which raises a fairly debatable issue as to that matter. City of St. Joseph v. Hankinson, supra. In City of St. Ann v. Buschard, supra, 356 S.W.2d 1. c. 575–576, this court held the burden of proof required of an annexing city in order for it to show the annexation reasonable so far as the area to be annexed is concerned was the same as when the court is considering reasonableness from the standpoint of the city; i. e., if, when viewed from the standpoint of the area to be annexed, the proof raises a fairly debatable issue regarding the reasonableness of the annexation the city has met the burden. The specific issue involved in this appeal is whether, viewing this proposed annexation from the standpoint of the area which the city seeks to annex, the proof rises to the required standard. We have concluded that it does not.

◼ In City of Aurora v. Empire Dist. Electric Co., supra, 354 S.W.2d, 1. c. 47, it was said that there should be " * * * a comparison of the relative benefit or detriment, in other words, fairness to the citizens of the annexed territory who have no voice in the proceedings for annexation * * *." A benefit would accrue at least at parts of the area which the city seeks to annex if sewer facilities were to be furnished. But the central portion of that area, St. Peters Estates, already has an adequate sewer system and over half of the population of the area which the city seeks to annex lives in this subdivision. This benefit not only is limited to less than half the population of the area which the city seeks to annex but is also conditional even as to that proportion of the population of the area. This for the reason the city does not have sewer facilities at present that it can extend to the unincorporated area. In order for this to be a benefit there would have to be a vote by the people involved to submit to a substantial financial obligation. The same is true of the water situation. The greater proportion of the population of the unincorporated area now has water available from a private utility and at a rate about one-third less than that which the city is presently charging. The western portion of the area to be annexed now is forced to rely upon individual wells and cisterns and to that portion of the area there is no doubt but the extension of water would be a substantial benefit. The eastern portion of the area to be annexed has no substantial need for water now, since it consists of the McMenamy tract and other undeveloped and unplatted land. Moreover, city water is now available to almost all of the eastern area as the city's water lines go right by it in order to reach the public school. It is clear from the evidence that the area which the city seeks to annex now has better police protection than city residents. The streets are in better condition and better constructed. Their maintenance in the city is generally the same as that in the unincorporated area; i. e., by the county and state highway department. Annexation would deprive the residents of the unincorporated area from benefits they now receive from county zon-

ing, mosquito and insect spraying, building and health ordinances and services. In addition the residents of the area which the city seeks to annex would be burdened with the city's present financial obligations and any obligations that the city would have to incur should annexation be approved. The proof adduced in this case is not sufficient to sustain the city's burden of showing that the annexation is reasonable when viewed from the standpoint of the area which is to be annexed, City of Aurora v. Empire Dist. Electric Co., supra, and it follows that the judgment of the trial court must be affirmed.

PER CURIAM.

The foregoing opinion by BRADY, C., is adopted as the opinion of this court. The judgment is affirmed.

WOLFE, P. J., and ANDERSON and RUDDY, JJ., concur.