CITY OF ASH GROVE, Missouri, a municipal corporation, Plaintiff-Respondent,

v.

Alta DAVIS, Defendant-Appellant,

and

Myrtle Hulston et al., Defendants.

No. 8659.

Springfield Court of Appeals.

Missouri.

July 28, 1967.

196

M.S. § 71.015; Laws 1953, p. 309] authorizing plaintiff, the City of Ash Grove, Missouri, to annex contiguous lands, the instant appeal has been perfected by defendant Alta Davis, who owns a tract of about 43 acres, most of which is in the area sought to be annexed (hereinafter referred to as "the proposed area").

Our appellate function is to review the case de novo and to reach our own conclusions with respect to the law and the facts, weighing and evaluating all competent evidence with due deference to the findings of the trial court where the credibility of witnesses is involved. V.A.M.R. Rules 87.11 and 73.01(d); V.A.M.S. §§ 527.070 and 510.310; City of Houston v. Duff, Mo.App., 338 S.W.2d 373, 375(1); City of Fulton v. Dawson, Mo.App., 325 S.W.2d 505, 516(1). As we review and consider the facts, we remain mindful of certain well-established principles, to wit, (1) that the Sawyers Act authorizes the proposed annexation only if (a) it "is *reasonable and necessary to the proper development of [the] city*" and (b) the city is able "to furnish normal municipal services" to the annexed area within a reasonable time [V.A.M.S. § 71.015; City of Aurora v. Empire District Electric Co., Mo.App., 354 S.W.2d 45, 48], (2) that reasonableness and necessity to proper municipal development are separate but closely related concepts [City of Olivette v. Graeler, Mo., 338 S.W.2d 827, 836–837(15); City of Woodson Terrace v. Herklotz, Mo.App., 349 S.W.2d 446, 448(1)], (3) that "both parties," i. e., both the city and property owners in the area sought to be annexed, are entitled to the test of reasonableness [City of Olivette, supra, 338 S.W.2d at 837(16); City of St. Ann v. Buschard, Mo.App., 356 S.W.2d 567, 575], (4) that the burden of pleading and proving the statutory prerequisites to annexation rests upon the city [City of Olivette v. Graeler, Mo., 369 S.W.2d 85, 93(3); City of Creve Coeur v. Patterson, Mo.App., 313 S.W.2d 739, 744 (3)], and (5) that the city carries its burden of proof when the evidence raises

E. W. Collinson, John B. Newberry, Springfield, for defendant-appellant.

John K. Hulston, Lincoln, Haseltine, Forehand & Springer, Wallace N. Springer, Jr., Springfield, for plaintiff-respondent.

STONE, Presiding Judge.

From a declaratory judgment entered in this action under the Sawyers Act [V.A.

"fairly debatable" issues as to those statutory prerequisites [City of St. Peters v. Kuester, Mo.App., 402 S.W.2d 70, 75(5); City of Creve Coeur v. Huddleston, Mo. App., 405 S.W.2d 536, 539–540(2)], which "merely means that if there is substantial evidence both ways, then the legislative conclusion [of the board of aldermen] is determinative." City of Olivette, supra, 369 S.W.2d at 96(5). See State ex inf. Mallett ex rel. Womack v. City of Joplin, 332 Mo. 1193, 1205, 62 S.W.2d 393, 398; State ex inf. Taylor ex rel. Kansas City v. North Kansas City, 360 Mo. 374, 397, 228 S.W.2d 762, 774(15). (All emphasis herein is ours.)

█ Ash Grove is a city of the fourth class situate in Boone Township, Greene County, Missouri, about eighteen miles northwest of Springfield. It is a clean, wholesome residential community, whose inhabitants are understandably proud of the historical fact (included in the transcript before us) that it was "established" by Nathan Boone, the youngest son of Daniel Boone. But, although the city has continued to grow in stature by reason of the character of its citizens and the attainments of its native sons, it passed its numerical peak more than thirty years ago when the Ash Grove Lime and Portland Cement Company, the only major employer in the community, terminated its operations there. So, like hundreds of towns in rural areas, Ash Grove has experienced a slow but steady erosion in population, as evidenced by United States decennial census figures read into the record by counsel and within our judicial ken anyway, to wit, 1107 in 1930, 1101 in 1940, 970 in 1950, and 886 in 1960. Varble v. Whitecotton, 354 Mo. 570, 575, 190 S.W.2d 244, 246(4); Kirst v. Clarkson Construction Co., Mo.App., 395 S.W.2d 487, 497–498(15). The accelerated rate of decline in later years was not stemmed by two annexations, one about 1945 and another about 1949 or 1950, and there is no evidence from which it reasonably might be inferred that any reversal in

trend has occurred since 1960 or is likely to occur in the foreseeable future. Many of the residents are retired, some work locally, and a substantial number are employed in Springfield. The city's counsel referred to Ash Grove as "a bedroom town . . . for people who work in Springfield."

Ash Grove has one regular police officer (identified by the city clerk as the "chief of police" and by the officer himself as "city marshal") who "is on call 24 hours a day" and some weeks is relieved by "a special police . . . maybe two nights." The city marshal is also a deputy sheriff, with a portion of his compensation paid by Greene County. He patrols and furnishes the same police protection in the city and in the proposed area; and when on night patrol, he usually can be reached only by radio through the sheriff's office. The city marshal serves in still another capacity as fire chief. The city owns a 1949 or 1950 model fire truck with a 300 gallon pumper tank and also provides "storage space for the Greene County truck." A squad of eight volunteer firemen man the equipment and answer calls both inside and outside the city. Within the corporate limits, the city truck is used and water is available through fire hydrants in the municipal water system. Without the city, the county truck is used and, of course, no water is available from the municipal system.

Residents of the annexed area, "all of them," already have water service from the municipal system; but, since mains outside the city have been laid by the customers, they are "small water lines . . . not sufficient for fire hydrants." To supply sufficient water "in case of a fire," larger mains would have to be laid. When asked "how many water mains" to the perimeter of the proposed area the city could lay in the event of annexation, the water and sewer superintendent said "one probably without any additional money."

The municipal sewer system was constructed in 1956 with capacity to handle

double the present load. Most of the business buildings and a few of the residences in the proposed area "are already on the sewer," having been connected at the expense of the property owners. Of the bonds issued for construction of the sewer system, general obligation bonds in the aggregate principal sum of $53,000 and revenue bonds in the aggregate principal sum of $64,000 remained outstanding at the time of trial. The last general obligation bonds mature in 1976 and the last revenue bonds in 1981. In the event of annexation, the sewer system could be extended to serve other residents in the proposed area only "through [another] bond issue." A periodic examination of the city's books and financial records by certified public accountants, completed only a few months prior to trial, showed that adequate balances were being maintained in the sinking funds and that the city's financial condition was good.

Ash Grove has no street department. As the city clerk explained, street maintenance "is done by the county but with our tax money"—"it is taken out of our tax money that the county collects." There is no showing that Ash Grove has a health department or officer; and there is no municipal zoning ordinance or building, plumbing or electrical code. The area outside the city already is "under the [county] zoning and planning commission that calls for an inspection of the sewage disposal, septic tank, lateral lines, footings [and] construction of the building proper."

Empire District Electric Company provides the same electric service at the same rates to customers in the city and in the proposed area. A 20-year natural gas franchise was granted to the Gas Service Company but the city's water and sewer superintendent added that "to comply with our ordinances they are to have our [distribution] system in . . . the Fall of 1966." At the time of trial in March 1966, construction had not begun either on the municipal distribution system or on the pipeline to supply that system.

The city clerk testified that the area within the present corporate limits of Ash Grove is 322.4 acres; but, although knowledgeable in practically every other field of interrogation, she declined to "even guess" as to the size of the proposed area. Pointing to the testimony of witness Hall, the sole member of the board of aldermen called to the stand, the *city's brief* states that "the only witness who gave a judgment as to the *acreage contained in the proposed area* to be annexed estimated it to be 150 acres which appears accurate from an examination of petitioner's exhibit 20," a large map of the city and proposed area (hereinafter referred to as "the map") drawn to scale and identified by the county surveyor. However, this was the testimony of witness Hall: "Q. [D]o you know *how many acres of vacant farm land* the city is proposing to take into the City of Ash Grove at the present time? A. Not exactly . . . Q. What is your judgment? A. *About 150 I would guess." Defendant's brief* opens with the statement that this action involves "the annexation of some 200 acres of land to the city," but the only transcript reference is to the annexation ordinance which (as it appears in the record) simply provided for annexation of the additional territory between the then city limits and the proposed city limits as outlined on the map attached to and made a part of the ordinance. Finding no testimonial statement indicating the total acreage in the proposed area, we have turned to the map and, calculating it as closely and carefully as we can, have found that the proposed area contains *approximately* 206 acres. About 112 persons reside in that area. Since the form and outline of the area within the present city limits and of the proposed area are highly irregular and defy intelligible linguistic portrayal, we here include a copy of the large map received in evidence, necessarily so reduced in size that much of the detail is illegible but which will perhaps, with the aid of the designations we have added, enable the reader to follow our discussion.

MAP OF
ASH GROVE, MISSOURI

The major part of the city is laid out with north-south and east-west streets, but the business and central portions are laid out on the bias on the northeast side of the tracks of the St. Louis-San Francisco Railway Company which enter the city at a point near the center of the south boundary and, running in a general northwesterly direction, wind through the city in a gentle, elongated S-curve, thus placing the major portion of the city on the northeast side of the tracks. U.S. Highway 160 with a two-lane blacktop roadway approaches from the northeast, enters the city at a point north of the center of the east boundary, runs due west through the city north of the business district until the highway right-of-way meets the railroad right-of-way, and then swings to the northwest as it runs out of the city alongside the curving railroad right-of-way.

Of the 206 acres in the proposed area, *approximately* 8 acres are contained in a curved prong (identified on the map and hereinafter referred to as the *west tract)* extending about 900 feet in a northwesterly direction from the *west* side of the city and embracing (1) the railroad right-of-way running in a general northwesterly-southeasterly direction, (2) the contiguous highway right-of-way on the northeast side of the railroad right-of-way, and (3) a strip of land, 200 feet in width, adjacent to and on the northeast side of the highway right-of-way. The only testimony concerning the west tract was that given by witness Keck, who filled treble roles as city marshal, deputy sheriff and fire chief; and the extent of his testimony pertaining to the west tract was (a) that there was a "traffic problem" in that the "speed limit is 70 miles an hour through the area . . . and there's a service station and people pulling out onto the highway on the curve" and (b) that there was a package liquor store "just outside the city." These unelaborated statements fall far short of the evidence offered in reported cases where the need for traffic regulation [e. g., Dressel v. City of Crestwood, Mo.App., 257 S.W.2d 236, 244,

247, 249; Rogers v. City of Deepwater, 240 Mo.App. 795, 219 S.W.2d 750, 756] and for keeping the peace [e. g., City of Deepwater, supra, 219 S.W.2d at 756; Seifert v. City of Poplar Bluff, Mo.App., 112 S.W.2d 93, 99], *together with other cogent factors*, have been deemed to support annexation. However, the annexation ordinance treated of the proposed area in its entirety, as have the parties in this proceeding, so we express no opinion concerning the reasonableness of and necessity for annexation of the west tract alone. City of Aurora, supra, 354 S.W.2d at 55–56(8).

The remainder of the proposed area, to wit, *approximately* 198 acres (hereinafter referred to as the *east tract)*, which includes those areas identified on the map as *northeast parcel, pocket, middle parcel* and *southeast parcel,* is contiguous to the present east boundary of Ash Grove. Beginning at the extreme northeast corner of the city limits, the present east boundary descends in an irregular stairstep pattern, punctuated north of the center of the east boundary by a relatively deep pocket (hereinafter referred to as the *pocket)*, 899.5 feet in depth, east and west, and 627 feet in width, north and south, at the open (east) mouth of the pocket. Approaching Ash Grove from the northeast, Highway 160 enters the mouth of the pocket at the north side thereof, runs through the pocket in a southwesterly direction, and crosses the present east boundary in the (west) base of the pocket, leaving a triangular tract of approximately six acres on the north side of the highway in the pocket and a somewhat larger tract on the south side of the highway in the pocket. When defendant's witness Joe Richter, a contractor, purchased the 6-acre tract on the north side of the highway in 1961, "the first thing I did was to see if I could get that 6 acres declared city property." Failing in that, Richter proceeded with construction of several small business buildings on his 6-acre tract and, at his own expense, connected them with the municipal water and sewer systems. Insisting that there was

no traffic problem on the highway in that area, Richter was opposed to annexation at the time of trial. Photographic exhibits show two filling stations and a small cafe on the south side of the highway in the pocket.

Below (south of) the pocket, the present east boundary resumes its irregular stair-step pattern with the southernmost step being a thin protruding finger of land 1,510 feet in length, east and west, and 390 feet in width, north and south. An east-west two-lane blacktop road (hereinafter referred to as the *Bois d'Arc road*), platted within the city as Crookham Street, runs down the center of this finger (identified on the map and hereinafter referred to as the *Crookham finger*) for the entire length thereof and thence out of the city. In our further discussion, we will refer to that portion of the east tract lying north of Highway 160 (exclusive of land in the pocket) as the *northeast parcel,* to that portion of the east tract lying between Highway 160 on the north and the Bois d'Arc road on the south (exclusive of land in the pocket) as the *middle parcel,* and to that portion of the east tract lying south of the Crookham finger and the Bois d'Arc road as the *southeast parcel.*

The *northeast parcel* embraces approximately 36.5 acres, and its eastern boundary is one-fourth mile east of the present boundary on the north side of Highway 160. Within this parcel, one small addition of five acres containing ten lots, known as the Buckley-Linderman Addition, was platted about five years before trial. During that period, seven houses had been built in that addition, one of which had, at the time of trial, been vacant "several months." There was no evidence as to the number or location of dwellings in the remainder of the northeast parcel.

The *middle parcel* embraces approximately 111 acres, the major portion of the east tract. The pocket is immediately west of the north part of that parcel. In the next stairstep south of the pocket, some of the

buildings of the Ash Grove consolidated school district are located just inside the present east boundary, while two new buildings just outside that boundary, which were under construction at the time of trial, no doubt have been completed. The next descending stairstep in the east boundary is the *Crookham finger,* in which there are homes on each side of the Bois d'Arc road. The east line of the *middle parcel* is a north-south country road known as Piper Road, which is almost three-fourths mile east of the point at which Highway 160 presently enters the city in the base of the pocket, one-half mile east of the present east boundary immediately south of the pocket, almost three-eighths mile east of that boundary at the next descending stairstep where the school buildings are located just inside and outside the boundary, and one-eighth mile east of the east end of the Crookham finger.

Defendant Alta Davis' tract is bounded on the south by the Bois d'Arc road. The major portion of that tract is outside the present city limits and in the southeast part of the *middle parcel,* but a portion of the tract and defendant Davis' home are inside the city. From that portion inside the city, "some lots" on the north side of the Bois d'Arc road have been sold; but only one lot outside the city, just east of the east end of the Crookham finger, has been sold. No part of the Davis tract has been platted and, in fact, there is no platted addition in the middle parcel and no evidence of any dwelling in that parcel, excepting only the home on the lot just outside the Crookham finger.

A draw runs from east to west through the center of the middle parcel and thus across the Davis tract providing natural drainage for all of the land in that parcel, i. e., from Highway 160 on the north and from the Bois d'Arc road on the south. "There's a branch down through [the draw]"; and, when asked whether it ever floods, the city's water and sewer superintendent agreed "I expect it does." Defendant Davis' son, Stanley, said that

"there's times when quite a bit of water runs down through there." There is a stock pond on the Davis tract. Outside the city, the tract is used for pasture and the only buildings on it are a stock barn and a grain bin. At the time of trial, Stanley Davis was running 12 head of cattle on it, but the previous year he had run about 50 head on it.

In the city's brief, counsel assert that witness Stanley Davis "admitted that the [Davis tract] was more valuable for building sites than for farm land" and "admitted that some lots had been sold from it for building sites and that the balance was being held for sale as lots until such time as a prospective purchaser would pay the required price." We quote the testimony to which counsel refer, as it appears immediately following the positive statement by witness Stanley Davis that "with the exception of the one [lot]," all lots sold by his mother, defendant Alta Davis, had been inside the city: "Q. Do you feel in your judgment that those lots that were sold off for building sites, does that make your land more valuable than as farm land there? A. I don't follow your question. Q. In your judgment is this land more valuable for building sites than it is for farm land? A. Yes. . . . Q. Isn't it because it is contiguous with the City of Ash Grove? A. People will pay more for building lots than they will for farm land. Q. Yes, and because it's right next to the City of Ash Grove won't they? A. Well, it was in the city. Q. And the ones (sic) you sold outside the city too. A. Yes. Q. Any more lots been offered out there for sale? A. We haven't had any buyers. Q. . . . If they came and paid you your price, you would sell them a lot or your mother would, wouldn't she? A. Yes, if they'd pay more than it was worth for farm land. Q. . . . You are probably holding that and wanting to sell them as lots in that area, are you not, sir? A. I'd be happy too (sic), if it ever happened." But after only two unrelated questions, we find the following: "Q. Is this land . . . other than be-ing used for pasture is it used for any other farming purpose? A. Not for crops. It's pasture land. . . . Of course the lower part of it there where that drain goes down through it, why pasture land is all it will ever be good for. Q. And the upper part of it is valuable for city lots? A. Just about what's been sold off, is all."

■ Taking the testimony of witness Stanley Davis as a whole, as we must do [Dimond v. Terminal R.R. Ass'n. of St. Louis, 346 Mo. 333, 353, 141 S.W.2d 789, 799(12); Cotton v. Voss Truck Lines, Mo.App., 392 S.W.2d 428, 433(4); Garrard v. State Dept. of Public Health and Welfare, Mo.App., 375 S.W.2d 582, 592(25)], we think it clear that its substance and import were simply that, since "people will pay more for building lots than they will for farm land," those lots which his mother had sold on the north side of the Bois d'Arc road were more valuable as building sites than as farm land; that he would "be happy" if any additional portion of the Davis tract could be sold for building sites; but that a part of the tract certainly would never be usable as anything other than pasture land and, in his judgment, his mother already had sold about all of the tract that would be suitable for building sites. Significantly, we think, no witness took issue with the two last-quoted answers of Stanley Davis and *there was no evidence demonstrating the suitability or the adaptability of the Davis tract outside the city for urban usage or showing that the value of such lands had been enhanced "by reason of their adaptability for prospective town uses."* State ex inf. Major v. Kansas City, 233 Mo. 162, 214, 134 S.W. 1007, 1022; City of Houston, supra, 338 S.W.2d at 379–380, and cases collected in note 9. *And there was no such testimony concerning any of the more than 150 acres of vacant, unplatted farm land included in the proposed area.* Contrast City of St. Joseph v. Hankinson, Mo., 312 S.W.2d 4, 14–15, 18–19; State ex inf. Major v. Kansas City, supra, 233 Mo. at 220–222, 227–229, 134 S.W. at 1024–1027. *For that matter, there*

*simply was no evidence of the reasonable market value of any of the lands in the proposed area at any time or for any use.*

The *southeast parcel* embraces approximately 37 acres, of which about 22 acres are in that portion of the R. L. Hayes Addition outside the present city limits, i. e., south of the Crookham finger and the Bois d'Arc road. Because two residents of that parcel testified, we know that some homes are located there, although strangely (to us) the transcript does not disclose their number. One resident contented himself with the simple statement "yes, I'd like to go in." The other was opposed to annexation. When asked whether he could connect with the municipal sewer system, he said that he could not "because I'm over the hill," thereafter describing the lay of the land in some detail.

■ Conceding that the population of Ash Grove "has not shown growth," the city's counsel suggest that "growth is evidenced in other ways," pointing to testimony of the postmistress that postal receipts almost doubled during the 10-year period from 1956 to 1965, inclusive, and to the "considerable increase" in the loans, deposits and assets of the Bank of Ash Grove during that same period. Of course, the postoffice serves a large surrounding area with rural routes covering about 166 miles, and patronage in that area coupled with sharply increased postal rates must have contributed substantially to the higher receipts. And, with the bank likewise serving customers outside as well as inside Ash Grove, the growth in the bank's loans, deposits and assets no doubt reflects not only the economic prosperity of the entire area and the uninterrupted inflationary trend during the past decade but also well-grounded public confidence in the sterling management and fiscal integrity of the bank. But this is not the kind of "growth" which, against a backdrop of steadily declining population, constitutes persuasive evidence that annexation of the proposed area of approximately 206 acres, which

would enlarge the city's present acreage by more than 63%, would be "reasonable and necessary to the proper development" of Ash Grove. V.A.M.S. § 71.015.

The city clerk stated that, since 1950, 46 homes and 13 businesses "have been added to the tax books"; but no one inquired, and the clerk did not report, how many had been dropped during the same period. She also testified that there were no vacant houses for rent inside the city and only two or three for sale, and that, although there were some *"desirable* lots," defined by her as "lots in a desirable part of town," and many *"undesirable* lots" within the city limits, "the *desirable* ones can't be bought" —"they can't buy them so they go outside." The city's evidence was to the effect that "the trend" of residential construction is "southeast and northeast" and of business construction is "on Highway 160." Defendant's son, Stanley Davis, who said that he had made "a survey" as to vacant lots and houses in Ash Grove, found 75 or more vacant lots—"level lots that would be suitable for building" and 15 or more vacant houses, "some that have been kept up and some that are practically falling down."

With an average population density of only 2.75 persons per acre *within the present boundaries* of Ash Grove (i. e., the 1960 census figure of 886 persons divided by the acreage of 322.4), we are not disposed to join in the statement of the city's counsel that "growth in the Ash Grove community" has been outside the city "because of the saturation of the land confined within the present city limits." However, for the purposes of this discussion we accept the testimony of the city clerk as to the unavailability of *desirable* lots within the corporate limits; and, proceeding on that premise, we probe the record to determine the nature and extent of new construction in the proposed area in recent years which, of course, represents the maximum measure of the city's claimed "growth" in that area.

When asked how many new homes had been built in the proposed area since the

city's unsuccessful attempt some 2½ years previously to annex an even larger tract of 346 acres, the city clerk answered "I know there is one out east and I can't remember if there's been maybe two over in the north part, I believe." To a similar inquiry, defendant's son Stanley Davis said "there is one house under construction, one that's been built [in the Buckley-Linderman Addition] that's been vacant for some time . . . there were two houses built in another part of the [proposed] area." The only witness of whom inquiry was made as to "growth" during a longer period of time was the city's witness Robert Hausman, a great-grandson of Nathan Boone, a lifetime resident of Ash Grove, and "a real estate broker and in the insurance business." When interrogated as to how many homes had been built in the proposed area in the past five years, Hausman's response was "I'd say 12 or 13, that I can think of"; and, as we have seen, 7 of those were in the Buckley-Linderman Addition in the northeast parcel of the east tract. Thus, the evidence most favorable to the city was that an average of no more than 2.6 homes per year had been constructed in the proposed area of 206 acres, and that more than one-half of those had been located in the 5-acre Buckley-Linderman Addition. There was no evidence of recent business construction outside the pocket. While we certainly do not share the dire view of defendant's counsel that Ash Grove is "a small city, dying a slow death," obviously the record does not permit us to find that the city actually has, within the past 30 years, experienced any substantial measure of "growth" within the meaning of that term as used in annexation cases. For, even if it be assumed (contrary to experience and probability) that since 1960 there has been no decrease in the number of inhabitants within the present city limits, taking into the city's fold all of the 112 persons said to inhabit the proposed area would do little more than recoup the population loss during the 1950–1960 decade.

As a relevant and material, although not in and of itself controlling, factual facet of the situation before us, we observe that the average population density of .54 person per acre *in the proposed area* (i. e., the population estimate of 112 persons divided by the acreage of 206) is, without exception, substantially lower than in any reported case in which annexation has been approved and the acreage and population figures have been recorded in the opinion [see cases collected in City of Houston, supra, 338 S.W.2d at 378 (note 6)], and that the human census of 112 persons is likewise substantially lower than the "cattle census" taken by defendant's son, Stanley Davis, which showed (so he testified without contradiction) that "on an average" 175 to 200 head of cattle are kept in the proposed area.

We have not overlooked other considerations urged upon us by the city's counsel, including, inter alia, the following:

(a) The fact that the acting school superintendent stated without objection that the board of education favored the proposed annexation in order that the two new school buildings just outside the present east boundary might have better fire protection and hopefully might carry lower fire insurance rates.

(b) The testimony of city marshal-deputy sheriff-fire chief Keck that there is an alleged "traffic problem" on Highway 160 in the *pocket* of the east tract, where motorists turn from and onto the highway in patronizing service stations and business establishments, and that it would be helpful to be able to enforce the municipal speed limit of 25 miles per hour in that area.

(c) The testimony of pastor Russell that his congregation of about 55 members had purchased land (the location of which was fixed no more definitely than that it was in the proposed area) with the intention of building a church thereon, and that he favored annexation because "it would give us the privileges if they did, to put in a

sewer system . . . and also we'd be more interested in the lighting out front, we really need the lighting and water." But we note also that on cross-examination this witness stated the sewer system presently is "close enough to our church that without too much expense we can go to it now" at the church's expense and "we are already hooked up to the city water through a neighbor but we don't have a meter," and that, as heretofore recorded, Empire District Electric Company furnishes the same electric service at the same rates both inside and outside the city.

▅ (d) The testimony of the city's water and sewer superintendent that, in the event of extension of the sewer system to serve the proposed area, "to have a gravitity (sic) feed you would have to follow this natural drainage," referring to the draw running from east to west through the center of the middle parcel. However, any such extension of the sewer system admittedly would require a bond issue; and, with most of the businesses and a few of the residences in the proposed area "already on the sewer," it would be speculative in the extreme and altogether unwarranted for us to assume that, if the proposed area were to be annexed, the electorate would approve a bond issue in sufficient amount to provide for extension of the sewer system to the unconnected residents in the proposed area, scattered as they are in the east tract of approximately 198 acres and widely separated as they are with some in the northeast parcel and others in the southeast parcel but only one home in the middle parcel. Furthermore, should the city need to make use of the draw or other land in the middle parcel in connection with the municipal sewer system, it could acquire the right to such use, by condemnation if necessary, regardless of whether the land was inside or outside the corporate limits. V.A.M.S. §§ 250.010(1), 88.844, 88.077.

▅ Cognizant that the "aids or guides developed by the cases before the Sawyer[s] Act are still helpful in arriving at a decision of the ultimate fact questions specified" in the statute [City of Olivette, supra, 338 S.W.2d at 837], we have reviewed again a multitude of our Missouri annexation cases. In thereafter sorting and resorting, sifting and resifting, pondering and repondering the facts reflected by the instant record, we have kept before us all of those aids or guides initially stated in the landmark case of State ex inf. Major v. Kansas City, supra, 233 Mo. at 213–214, 134 S.W. at 1022, and reiterated in many subsequent cases [see those cited in City of Houston, supra, 338 S.W.2d at 380 (note 10)] and also the *additional factors* recognized as having some relevance in certain situations [City of Houston, supra, 338 S.W.2d at 380(5) and cases collected in note 11], all of which need not be detailed again in this opinion. And we have been particularly mindful that a city is not foreclosed from annexing adjacent territory simply because it may yet have undeveloped tracts within its present boundaries [City of Fulton, supra, 325 S.W.2d at 517] or because its citizens will not build within certain areas [City of Joplin, supra, 332 Mo. at 1206, 62 S.W.2d at 399; Faris v. City of Caruthersville, Mo.App., 301 S.W.2d 63, 69(11)], and that a case of reasonableness and necessity to proper municipal development may be made for annexation of contiguous land "even though a part of the land is vacant, or a small portion thereof is used for agricultural [or pasturing] purposes." City of Crestwood, supra, 257 S.W. 2d at 249(7); City of St. Ann v. Buschard, Mo.App., 299 S.W.2d 546, 551.

▅ On the other hand, city officials no longer may rely upon a strong current of presumptive reasonableness and validity (which ran in earlier cases, e. g., City of Caruthersville, supra, 301 S.W.2d at 68) to carry them into the haven of a favorable judgment. City of Houston, supra, 338 S.W.2d at 382; City of St. Ann, supra, 356 S.W.2d at 575. Although such officials have the right and the duty to provide for fairly foreseeable needs for the reasonably

predictable future [City of St. Joseph, supra, 312 S.W.2d at 18; City of Woodson Terrace, supra, 349 S.W.2d at 451], annexations may not be found reasonable and necessary to proper municipal development on the basis of "'visionary'" needs [City of Aurora, supra, 354 S.W.2d at 48(5); Stoltman v. City of Clayton, 205 Mo.App. 568 586, 226 S.W. 315, 321] or "vaulting ambition." Jones v. City of Clayton, Mo.App., 7 S.W.2d 1022, 1025. "The expansion and rate of growth during the immediate past furnishes some criterion by which to judge the immediate future, for the expansion needs of a stagnant city with a static population would not be the same as those of a city with an expanding economy and a growing population." City of Caruthersville, supra, 301 S.W.2d at 69. Otherwise put, in annexation cases a look over the shoulder into the past is usually helpful in sharpening one's vision to peer into the future.

▮ The issues of reasonableness and necessity are not to be resolved by any rule or formula [City of Creve Coeur, supra, 313 S.W.2d at 744; Mauzy v. City of Pagedale, Mo.App., 260 S.W.2d 860, 864(3)], and the aids or guides stated in the cases simply point out factors of which the court should be cognizant, with each relevant factor to be considered in relation to the other relevant ones and with no single factor a legal absolute in the sense that it is conclusive. City of St. Peters, supra, 402 S.W.2d at 74(3); City of Aurora, supra, 354 S.W.2d at 48. In the final analysis, each annexation case presents a separate and distinct problem to be determined on its own facts and circumstances. City of St. Joseph, supra, 312 S.W.2d at 17; Johnson v. Parkville, Mo.App., 269 S.W.2d 775, 778.

▮ Having scrutinized the facts in the case at bar in the light of all of the relevant guides suggested in prior annexation cases, we are unable to escape the conclusion that the city has failed to carry its burden of proof by adducing "substan-

tial evidence" [City of Olivette, supra, 369 S.W.2d at 96(5)] that annexation of the proposed area of approximately 206 acres, three-fourths of which is vacant, unplatted farm and pasture land, "is reasonable and necessary to the proper development of [the] city." V.A.M.S. § 71.015. We hasten to add that this holding should not be misunderstood as indicating the view that *no annexation* of additional territory could be supported. But the fact that a case of reasonableness and necessity might be made for annexation of certain portions of the proposed area does not make the proposed annexation reasonable and necessary in its entirety. City of Aurora, supra, 354 S.W. 2d at 55(7); City of Sugar Creek, Mo. v. Standard Oil Co., 8 Cir., 163 F.2d 320, 324(7). We have neither authority nor desire to redraw the boundaries laid out by the board of aldermen. That being a legislative function [City of St. Joseph, supra, 312 S.W.2d at 17(14); City of Joplin, supra, 332 Mo. at 1203, 62 S.W.2d at 397], such revision of boundaries is for the city itself acting through its legislative body. However, it may not be inappropriate to comment that even casual examination of the map should serve to suggest changes in the present proposal which not only would enable the city to support a modest annexation but also would extend to residents of the proposed area as well as the new school buildings just outside the present east boundary whatever benefits might accrue from annexation to the city.

Entertaining, as we do, the highest respect for the distinguished trial judge, we have been slow to reach, and reluctant to announce, a conclusion contrary to his. But appellate review would become an empty formality and we would be unworthy of the trust reposed in us, if we yielded our firm conviction simply because he, with an equal sense of justice, found differently. Dodds v. Dodds, Mo.App., 353 S.W.2d 810, 814; Shilkett v. Shilkett, Mo.App., 285 S.W.2d 67, 72; Campbell v. Campbell, Mo.App., 281 S.W.2d 314, 319; Prudot v. Stevens, Mo.App., 266 S.W.2d 756, 758. In this

connection it should be pointed out that in our protracted study of the case the precise testimony as recorded in the transcript has been available to us for repeated reference, whereas he had no such opportunity.

The judgment of the circuit court is set aside and the cause is remanded with directions to enter a judgment dismissing plaintiff's petition with prejudice as of March 16, 1966, the date of the original judgment.

HOGAN and TITUS, JJ., concur.